1999 OK CR 33

**Gilberto MARTINEZ, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F–97–583.

Court of Criminal Appeals of Oklahoma.

Aug. 26, 1999.

Rehearing Denied Oct. 8, 1999.

Mark Barrett, Anne M. Moore, Oklahoma Indigent Defense System—Capital Trial Division, Norman, OK, for appellant at trial.

Brad Leverett, Assistant District Attorney, Altus, Oklahoma, for the State at trial.

Gloyd G. McCoy, Coyle & McCoy, Oklahoma City, OK, for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Asst. Attorney General, Oklahoma City, OK, for the State on appeal.

Dan Deaver, Assistant District Attorney, Frederick, Oklahoma, for the State on appeal.

## OPINION

LUMPKIN, V.P.J.

¶ 1 Appellant Gilberto Martinez was tried by jury and convicted of two counts of First Degree Murder (felony murder) in violation of 21 O.S.1991, § 701.7, in Case No. CRF–87–48, District Court of Tillman County.[1] The jury found the existence of two (2) aggravating circumstances [2] on both counts and recommended a punishment of death. The trial court sentenced Appellant in accordance with this recommendation. From this judgment and sentence, Appellant has perfected this appeal.[3]

---

1. Appellant's original murder conviction was reversed and remanded for a new trial by this Court in *Martinez v. State*, 1995 OK CR 52, 904 P.2d 138. Our reversal was based upon two errors: denial of Appellant's constitutional right under the Confrontation Clause of the Sixth Amendment to cross-examine David Castillo; and the failure to instruct the jury on the sentencing option of life without parole.

2. The jury found the murders were especially heinous, atrocious, or cruel and Appellant knowingly created a great risk of death to more than one person.

3. Appellant's Petition in Error was filed in this Court on October 17, 1997. Appellant's brief was filed on May 19, 1998. The State's brief was filed on September 15, 1998. Appellant filed a

¶2 In the early morning hours of June 6, 1987, a fire broke out in Mary Castillo's home in Frederick, Oklahoma. Mary's five children had been left home alone. Her three sons, David (age eleven), Louis (age eight), and Angel (age six) escaped without injury. Three year old Margaret and four year old Reynalda died in the fire. The official cause of death was acute carbon monoxide intoxication from smoke inhalation. Margaret Castillo was Appellant's daughter.

¶3 The evidence at trial revealed the fire had been intentionally set. Gasoline had been poured along the baseboards of the living room and in the girls' bedroom. The primary question in the trial was whether Appellant had set the fire.

¶4 The State theorized Appellant set the fire in revenge after seeing Mary Castillo dancing with another man at the Paso Del Norte bar earlier in the evening. Appellant confronted Mary and threatened her. He was removed from the bar. Thereafter, he was seen at Mary's home before the fire broke out. The State's primary witness, David Castillo (eleven years old on the night in question), testified that he saw Appellant pouring gasoline around the house and lighting the fire.

¶5 The defense theorized that David Castillo had started the fire. Evidence was presented regarding prior fires David had allegedly set. Appellant's first trial was reversed, in part, because the defense had not been allowed to cross-examine David regarding these past instances.

## PRE-TRIAL ISSUES

### A.

¶6 In his sixth proposition of error, Appellant claims he was denied his rights under Article 36(1)(b) of the Vienna Convention on Consular Relations, 21 U.S.T. 77. As a Cuban-born foreign national, he claims he was entitled to be notified of his right to assis-

tance from his foreign consulate. He claims the Vienna Convention should be treated as the supreme law of the land.[4]

■ ¶7 Article 36(1)(b) of the Vienna Convention provides, in pertinent part:

[I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

21 U.S.T. at 101 Appellant has failed to show he made any "request" to state authorities to inform Cuban authorities of his arrest. For all we know, under the record before us, Cuban authorities were properly notified under this provision.

¶8 In *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) the United States Supreme Court rejected a habeas petitioner's claim that the Vienna Convention was violated when arresting authorities failed to inform him that he had the right, as a foreign national, to contact the Paraguayan consulate. The Court determined the petitioner had waived the claim by failing to assert it in his state court proceedings. *Id.*, 523 U.S. at 375–76, 118 S.Ct. at 1355. While acknowledging the Vienna Convention, as a U.S. Treaty, could be considered part of the "supreme law of the land," the Court noted that the Anti-terrorism and Effective Death Penalty Act, 28 U.S.C.A. § 2254(a) and (e)(2) (West Supp.1998), provides that a habeas petitioner alleging he is held in violation of "treaties of the United States" will, as a general rule, not be afforded an evidentiary hearing if he "has failed to

reply brief on November 4, 1998. The case was submitted to the Court on September 21, 1998, and oral argument was held on April 20, 1999.

4. In analyzing this proposition, we begin by noting Appellant has provided no citations to the

record regarding where this claim was raised during his trial. Furthermore, Appellant fails to state how he may have been prejudiced by the alleged violation.

develop the factual basis of [the] claim in State court proceedings." *Id.* at 376, 118 S.Ct. at 1355. Furthermore, the Court noted, even if the Vienna Convention claims had been properly raised and proven, "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Id.* at 377, 118 S.Ct. at 1355. The Court determined the asserted prejudice was "speculative."

 ¶ 9 Here, Appellant has failed to show he attempted to exercise his rights under the Vienna Convention by making "requests" to "competent authorities of the receiving state". He has also failed to show this issue was properly raised or preserved at trial. He has further failed to show any prejudice resulting from the alleged violations. We therefore find this proposition to be without merit.

### B.

¶ 10 In his thirteenth proposition of error, Appellant claims the trial court committed reversible error by failing to grant Appellant's pre-trial motion to suppress.[5] He claims his arrest warrant was invalid because the warrant was not supported with an affidavit or sworn testimony.[6] Appellant claims

this violates 22 O.S.1991, § 171, which provides:

> When a complaint, verified by oath or affirmation, is laid before a magistrate, of the commission of a public offense, he must, if satisfied therefrom that the offense complained of has been committed, and that there is reasonable ground to believe that the defendant has committed it, issue a warrant of arrest.

Appellant argues that the mere fact a warrant was obtained prior to arresting Mr. Martinez does not relieve the state from showing probable cause existed at the time of arrest.[7] He claims probable cause was "nonexistent" at the time of his arrest and therefore evidence seized from him after his arrest, including his "gas stained clothes," should have been suppressed.[8]

 ¶ 11 Appellant was arrested by Frederick police officer Gary Sanders at approximately 8:00 a.m. on the day the fire occurred.[9] At the time of his arrest, Appellant was sitting in a chair on the front porch of his residence. Prior to the arrest, an arrest warrant had been issued by the Honorable Harrison Roe, Associate District Judge, Tillman County. The arrest warrant indicates a "[c]omplaint in writing and upon oath having been this day made before me." The arrest warrant, executed by Sergeant

---

5. On March 6, 1997, Appellant filed a Motion to Suppress Evidence Seized Incident to an Illegal Arrest. (O.R. at 540.) The motion was argued before the Honorable David Barnett, Associate District Judge of Tillman County, on March 25, 1997. After entertaining brief arguments from counsel, Judge Barnett overruled the motion without comment. (3–25–97 Tr. at 25–28.)

6. The arrest warrant is found on page 6 of the original record.

7. In response to this proposition, the State offers one lone argument: that Appellant failed to timely object to the legality of his arrest prior to entering his not-guilty plea, thereby waiving appellate review of the issue. *Clayton v. State*, 1992 OK CR 60, 840 P.2d 18, 28. This argument is not supported by the record. On January 22, 1988, i.e. prior to his original trial, Appellant filed a motion to suppress "all evidence ... obtained as a result of the Defendant's arrest and search of his person and property ... for the reason that the same was illegal and in violation of Defendant's statutory and constitutional

rights." (O.R.48.) Later that same day, Appellant was formally arraigned and entered his plea of not guilty. (O.R.934.) When this matter was remanded for a new trial, a new arraignment was not required. Thus, the issue is properly preserved.

8. Interestingly, after Appellant filed his first motion to suppress, on January 22, 1988, the State confessed the motion. (2–16–88 Tr. 2–3.) After a new trial was granted by this Court, the State withdrew its stipulation and sought admission of certain evidence, including evidence taken from Appellant's person while he was being held in jail. This led to the filing of two motions to suppress. (O.R.370, 540.) The first motion, which mainly concerned search warrants, not the arrest warrant, was sustained in part and overruled in part. (2–26–97 Tr. 38–77.) The second motion, which concerned the arrest warrant, was overruled without comment as set forth above.

9. Officer Sanders' testimony can be found at Tr. VI, 1119–24, 1128–32.

Gary Sanders on June 6, 1987, was not filed until ten (10) days later and no affidavit or sworn testimony was filed with it.

¶ 12 During Appellant's retrial, Officer Sanders testified that, at the time he arrested Appellant, he had possession of the arrest warrant issued by Judge Roe earlier that morning. Sanders also testified that, even independent of the arrest warrant, he felt as though he had probable cause to arrest Appellant. His belief was based upon: interviews with other police officers at the crime scene indicating Appellant had been in an altercation with Mary Castillo on the night in question and had threatened to kill her; prior domestic calls he had answered between Appellant and Mary Castillo, including one where Appellant hit Ms. Castillo in the face and chased her with a machete; an interview with patrolman Mike Law indicating one of the boys had seen Appellant running from the residence at the time the fire occurred; and an interview with David Castillo confirming this point.

¶ 13 We find Officer Sanders' testimony to be dispositive of this proposition. Although the arrest warrant was defective,[10] we find Sanders had probable cause to arrest Appellant even without a warrant.

¶ 14 The test of probable cause is "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). One does not have probable cause unless he had information of facts which, if submitted to a magistrate, would require issuance of an arrest warrant. *Jacobson v. State*, 1984 OK

CR 72, 684 P.2d 556, 559. If probable cause exists, however, no warrant is required to apprehend a suspected felon in a public place. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); 22 O.S.1991, § 196. For Fourth Amendment purposes, the United States Supreme Court has drawn a line at the entrance of the home. *New York v. Harris*, 495 U.S. 14, 18, 110 S.Ct. 1640, 1643, 109 L.Ed.2d 13 (1990). Thus, in *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976), the Supreme Court found that the defendant was in a public place while standing in the doorway of her house. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980). These rules apply to the instant scenario, and the proposition is without merit.

### FIRST STAGE TRIAL ISSUES

#### A.

¶ 15 In his fourth proposition of error, Appellant alleges the trial court committed reversible error when it allowed the State to introduce the testimony of Angel Castillo, (six years old when the fire occurred). Appellant argues the testimony was described by this Court as having "no weight" in our prior opinion. *See Martinez v. State*, 1995 OK CR 52, 904 P.2d 138, 140, n. 1 (majority opinion). He claims this Court's prior determination is now "law of the case," a legal doctrine similar to collateral estoppel.[11]

¶ 16 Appellant filed a pre-trial motion to exclude Angel Castillo's testimony. The motion was denied. When Angel was called to testify during the trial, defense counsel did not renew the motion to exclude.

---

10. During the March 25, 1997 hearing on Appellant's Motion to Suppress Evidence Seized Incident to an Illegal Arrest, Assistant District Attorney Dan Deaver acknowledged that the arrest warrant "may very well be" defective. (3–25–97 Tr. 26.) However, he argued the arrest was still valid because "probable cause did exist."

11. The term "law of the case," as generally used, designates the principle that if an appellate court has passed on a legal question and remanded the cause to the court below for further proceedings, the legal question thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain the same. Black's Law Dictionary, 886–87 (6th ed.1990).

¶ 17 Appellant has not cited to any decision of this Court which adopts the "law of the case" doctrine. Indeed, Appellant has not cited any persuasive authority from any jurisdiction which holds such doctrine would render Angel Castillo's testimony inadmissible upon Appellant's retrial. Even if the "law of the case" doctrine were applicable to criminal trials in Oklahoma, we find it is not applicable to this factual scenario. Here, we are guided by clear statutory provisions.

¶ 18 Oklahoma law sets forth the procedure to be used in capital cases "when an appeal has been taken and the cause has been remanded for a new trial." 22 O.S. 1991, § 951(B). That procedure, found at 22 O.S.1991, § 951(A), provides:

> A new trial is a reexamination of the issue in the same court, before another jury, after a verdict has been given. The granting of a new trial places the parties in the same position as if no trial had been had. All the testimony must be produced anew except of witnesses who are absent from the state or dead, in which event the evidence of such witnesses on the former trial may be presented; and the former verdict cannot be used or referred to either in evidence or in argument, or be pleaded in bar of any conviction which might have been had under the indictment or information.

Under this provision, when Appellant was granted a new trial, he was placed in the same position as if his first trial had never occurred. That being so, Appellant had the opportunity to call witnesses in defense of the charges brought against him, and the State had the opportunity to call witnesses to prove Appellant committed the offense. The competency of such witnesses and the admissibility of their testimony would be subject to the normal rules of evidence.

¶ 19 Pursuant to 12 O.S.1991, § 2601, "Every person is competent to be a witness except as otherwise provided in this Code." Furthermore, to be admissible, a witness' testimony must be based upon personal knowledge, pursuant to 12 O.S.1991, § 2602, and must be relevant, i.e. it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.1991, §§ 2401, 2402.

¶ 20 Angel Castillo's testimony satisfies these requirements. During Appellant's retrial, Angel testified that, on the night of the fire, he was in his bedroom. He heard the door open from the back room and then saw somebody walk through his room. He did not see the person's face, but thought it was Appellant because "his hair was down, like he always had it, and it was puffy in the back." The room was dark, but light enough to "tell who it was." This testimony was based upon Angel's personal knowledge and was clearly relevant.[12] His testimony was entitled to some weight.[13] It is the role of the trier of fact, in this case the jury, to determine the weight and credibility of a witness, not this Court. Thus, we cannot say the trial court abused its discretion in admitting Angel Castillo's testimony.

## B.

¶ 21 In his fifth proposition of error, Appellant claims he was denied a fair trial because the trial court ruled expert evidence regarding juvenile fire setting was inadmissible. He claims this ruling prevented him from presenting a complete defense.

¶ 22 This issue was first presented in pre-trial proceedings when Appellant filed a Motion for Leave to Add First Stage Expert

---

12. We recognize Angel's testimony was impeached somewhat by defense counsel. Counsel questioned Angel about a prior inconsistent statement Angel made during Appellant's first trial to the effect that he not see Appellant in his room on the night of the fire. This was the proper method of testing Angel's credibility.

13. This Court's prior statement that Angel's testimony was entitled to "no weight" was based upon inconsistent statements Angel made during that trial. However, this Court is not a trier of fact and should not attempt to invade the province of the jury. At the time, Angel was a six year old child testifying under the most stressful of circumstances. When Appellant's retrial occurred, Angel was sixteen years old and thus much more capable of understanding the nature of a trial and his responsibilities when testifying under oath. The jury properly determined the weight and credit to give to his testimony.

to Witness List. During arguments on the motion, defense counsel stated Appellant's arson expert had come to the conclusion that the fire was consistent with being set by a juvenile. Defense counsel then argued psychological testimony was needed in this area to "speak to the factors that cause juveniles to set fires." [14] Defense counsel reasoned "they (juveniles who set fires) tend to have certain things in their backgrounds. They tend to go in certain patterns." [15] The State argued such testimony would invade the province of the jury and was filed too late. The trial court denied the motion without comment, perhaps due to untimeliness.[16]

¶ 23 At trial, the issue resurfaced when David Castillo was cross-examined. Defense counsel asked David about an instance which occurred after the fire, when David's father had him committed to a mental health institution. Specifically, defense counsel asked whether David's father had lied when he said David was "threatening to kill him." The State objected to this line of questioning, and a bench conference was held.

¶ 24 During the bench conference, defense counsel made an offer of proof regarding two areas they wished to explore regarding David Castillo's mental health. First, defense counsel outlined records and testimony concerning events which happened to the Castillo children before the fire. This evidence included records from the Department of Human Services and testimony from D.H.S. case workers, police officers, and school officials to show "patterns of emotional and psychological neglect." [17] Second, defense counsel outlined documents and witnesses, including a child psychiatrist from the University of Oklahoma Medical School, which would go toward "events after the fire and David Castillo's psychological problems, his hospitalization for mental treatment, the pattern of emotional and psychological neglect and absent parent ." [18] Defense counsel indicated these records showed a pattern

characteristic to children fire-setters, including that David suffered from post-traumatic stress syndrome. In response, the State argued there was no proof David had any psychological problems before the fire, and David's problems after the fire were the result of having his sisters killed in a fire.[19]

¶ 25 The trial court expressed its concern about post-fire evidence which showed David was in a category of persons who might have started the fire. The trial court considered whether David's problems could just as likely have resulted because he witnessed the fire and was a victim of it.[20] Later, the court ruled:

Let's make clear the line of demarcation, if you will. Evidence which would tend to show state of mind, pattern of behavior, identification of this child as a child with those behavior patterns that would be associated with a firesetter prior to the incident, those would be admissible, given, I mean, other objections obviously not considered. But post-occurrence behavior patterns, I believe the prejudicial probative equation comes down in favor of prejudicial, and those should be excluded.

As we have often stated, the admissibility of evidence is within the discretion of the trial judge, and unless a clear abuse of discretion is shown reversal will not be warranted. *Ashinsky v. State*, 1989 OK CR 59, 780 P.2d 201, 204. Here, we find the trial court did not abuse its discretion in making this evidentiary ruling.

¶ 26 Although couched in terms of expert testimony, the proposed testimony regarding characteristics of juvenile fire-setters is actually evidence of a person's character or a trait of his character which was offered for the purpose of proving the witness' action in conformity therewith. However, character evidence relating to a witness is limited. *See* 12 O.S.1991, § 2404(A)(3). Such testimony is not admissible based on the facts of this case,

**14.** 3–25–97 Tr. 13.

**15.** 3–25–97 Tr. 20.

**16.** Tr. 904.

**17.** Tr. 905.

**18.** Tr. 906.

**19.** Tr. 908.

**20.** Tr. 910.

except as allowed by 12 O.S.1991, § 2608. Even when credibility of a witness is at issue, specific instances of the witness' conduct may not be proven extrinsically, but may, in the court's discretion, where probative of truthfulness or untruthfulness, be inquired into on cross-examination. *See* 12 O.S.1991, § 2608(B).

¶ 27 We find the probative value of post-fire evidence relating to David Castillo's mental health to be slight at best. While David's possible participation in this crime was certainly a key issue in the case, we cannot overlook the fact that his post-fire psychological problems could be the result of a momentous event, i.e. witnessing the death of his sisters. Therefore, we believe the trial court was correct in finding the relevance of such evidence substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury. *See* 12 O.S.1991, § 2403.[21]

### C.

¶ 28 In his first proposition of error, Appellant claims there is insufficient evidence to sustain his murder convictions. We disagree.

[11] ¶ 29 When the sufficiency of the evidence is challenged on appeal, this Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *accord Spuehler v. State*, 1985 OK 132, 709 P.2d 202, 203–04. Applying this test, we find any rational juror could have

found Appellant committed the crime of murder beyond a reasonable doubt.

¶ 30 A brief summary of relevant evidence supporting the verdict shows Appellant had been living with Mary Castillo and her children in 1987, but moved out at some time before the fire. The relationship between Appellant and Mary was turbulent. There had been past incidents of domestic abuse, serious threats,[22] assaults with fists, and numerous calls to the police station.[23]

¶ 31 On the night of the fire, Appellant became mad when he found out Mary Castillo was going out for the evening.[24] Mary left for the Paso Del Norte bar at about 9:00 p.m. Appellant showed up at the bar sometime thereafter. Mary went out on the dance floor and began dancing with a man named Juan. Appellant approached Mary and told her to come with him, but she refused. Appellant responded by hitting Mary, yelling at her, and threatening Juan.[25] Appellant also stated he would hit her again. One witness saw Appellant carrying a knife, while another witness saw him "going down toward his pants legs."[26] The bar owner, Felix Gonzales, then escorted Appellant out of the bar. As he was escorted out, Appellant said to Mary, "Tu vas a pagar," which means "you're going to pay."[27] He later repeated the threat and told Gonzales he was "going to get" Mary Castillo that night.[28] Appellant left the bar between 12:30 and 1:00 a.m.

¶ 32 Several hours before the fire, Abel Gonzales, who lived one block to the south of Mary Castillo, was riding his bicycle when he saw Appellant's car parked at an angle behind the Castillo home. There were no lights on inside the home. Gonzales saw a

21. In so ruling, we note Appellant has cited no case law from any jurisdiction which allowed psychological evidence of tendencies of juvenile fire-setters to be admitted into evidence.

22. Appellant threatened to kill Mary if she was ever with another man. (Tr. 708.)

23. Tr. 706–11.

24. At one point, Mary testified that she remembered Appellant getting mad with her before she went out that night. Later, she said he did not. However, during the preliminary hearing, she testified, Appellant got mad and "drove off real

crazy." (Tr. 715–718.) A neighbor testified she had heard Appellant fighting with a woman earlier in the day, which she stated was a "common occurrence." (Tr. 796.)

25. Tr. 665, 683, 722.

26. Tr. 664–65, 683. In earlier testimony, Mary also claimed she saw the knife, but at trial she could not remember. (Tr. 723–24.)

27. Tr. 683–84, 726–27.

28. Tr. 666, 671, 691.

person at the back door of the home "reaching above the door, like looking for a key to get in the house." Twenty minutes later, Gonzales returned and saw the same car pulling back up to the residence with its lights turned off.[29]

¶ 33 Mildred Edwards, a neighbor who lived to the north of the Castillos, testified that she ran a wrecker service. On the night in question, she had made a wrecker call and returned to her home at a little before 3:00 a.m. She saw Appellant at the Castillo home and spoke with him. Ms. Edwards had also seen Appellant earlier that evening. Appellant had asked to borrow some gasoline. Ms. Edwards testified Appellant "left very fast" from the residence.[30] Ms. Edwards went inside to her bathroom to doctor her foot. At that point, a neighbor knocked on her door and said the Castillo's house was on fire.[31]

¶ 34 David Castillo testified he was awakened by the sound of a banging on his mother's window. He recognized Appellant's voice calling, "Maria, where you at" in Spanish. Later, David heard a banging on the front door. He got up and saw Appellant pouring gas in the living room. Appellant was "pouring gasoline in the front, by the front door, ... and he went into my sisters' room." David testified Appellant then "caught the house on fire."[32] He also testified that he saw Appellant's face.[33]

¶ 35 In addition to this testimony, there is the testimony from Angel Castillo which we addressed above. Further, Fire Marshall Larry Odem testified regarding "pour patterns" of gasoline which went into the girls' bedroom, across the girls' mattress and up to the area of a trash can sitting in the middle of that room.[34] Carpet samples under that trash can also revealed the presence of gasoline.[35] When Appellant was arrested, his

clothing was tested, and the presence of gasoline was detected.[36]

¶ 36 Most of Appellant's argument regarding this proposition concerns the credibility of David Castillo's testimony. However, a fundamental premise of our criminal trial system is that "the jury is the lie detector." *United States v. Scheffer*, 523 U.S. 303, ——, 118 S.Ct. 1261, 1266, 140 L.Ed.2d 413 (1998), *quoting United States v. Barnard*, 490 F.2d 907, 912 (9th Cir.1973). Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Scheffer*, 523 U.S. at ——, 118 S.Ct. at 1266, *quoting Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S.Ct. 720, 724–25, 35 L.Ed. 371 (1891). This proposition is denied.

### D.

¶ 37 In his second proposition of error, Appellant claims the prosecutor committed fundamental error by attempting to define "reasonable doubt" during closing arguments. He sets forth three instances to support his argument.

¶ 38 During closing arguments, the prosecutor told the jurors "according to the Instructions, we have the burden to prove each of those beyond a reasonable doubt. And I know you've heard the phrase, 'Beyond a shadow of doubt.' Well, that's not the standard. The standard is, beyond a reasonable doubt." Defense counsel lodged an objection to these comments, and the trial court sustained the objection.

¶ 39 We find no error occurred with respect to this argument. In *Hammon v. State*, 1995 OK CR 33, 898 P.2d 1287, 1305, this Court found "no error" was committed

---

29. Tr. 757–59.

30. Tr. 794–97.

31. Tr. 803.

32. Tr. 843–44.

33. Tr. 847–49. David admitted he testified at the preliminary hearing (when David was eleven) and stated he did not see Appellant's face.

34. Tr. 1050.

35. Tr. 1061, 1162.

36. Tr. 1162–64.

when a prosecutor made the statement that "reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt." Similarly, in *Lenard v. State*, 1990 OK CR 55, 796 P.2d 636, 638, we held such statements are "merely an attempt by the prosecution to dispel commonly held attitudes rather than an attempt to define reasonable doubt."

¶ 40 The second alleged instance occurred when the prosecutor stated, "It (unbelievable evidence) shouldn't create any doubt. I submit we have done that. We have met our burden." Appellant claims these statements were the prosecutor's own personal opinions made along with his effort to define reasonable doubt. No objection was made to these comments, however, thereby waiving all but plain error. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 695–96. We find no error in these comments. They were fair comments on the evidence, within the scope of proper argument, and not the prosecutor's personal opinions.

¶ 41 In the third alleged instance, the prosecutor made the following comments during closing argument rebuttal:

Yeah, there is inconsistencies, and there is doubt. You give him ten years, three-to-five shots at all the witnesses and investigators and experts and two good lawyers that have worked on this case for years, you bet there is doubt. And you bet they've created doubt. That's what they're for. But is it enough to excuse Mr. Martinez from being held responsible for what he did? There is doubt, and there is contradictions, and mistakes were made.

You ever heard of a case that didn't have those in it? If you came in here expecting me to be able to prove to you a perfect case, ten years later, then you've been disappointed, and you didn't get it, and you're never going to get it. You know why, because the police and the firemen

and the D.A., we're all human. We all make mistakes. And you imagine the difficulty we have had putting this case together ten years later. That's why there is this standard called "beyond a reasonable doubt." I don't have to present a perfect case, just a reasonable one.

Defense counsel promptly objected that the prosecutor was attempting to define reasonable doubt. The trial court sustained the objection, stating, "That's stricken. The jury is admonished to disregard the definition of the standard."

¶ 42 These last comments are quite similar to those made in *Rogers v. State*, 1986 OK CR 104, 721 P.2d 820, 825–26 (the trial is about "reasonable theory, reasonable doubt."). There, we found the prosecutor's "fleeting comments" did not prejudice the defendant. Moreover, in *Rogers* we noted the defendant's objection to the prosecutor's remark was not only sustained but the jury was thoroughly admonished, thus curing any error which may have occurred. The same rule applies here.

### E.

¶ 43 In his third proposition of error, Appellant claims he was denied a fair trial because of improper comments and actions by the prosecutor during the first stage of his trial. Appellant begins with instances which he claims improperly cast aspersions on the defense.

¶ 44 Many of the alleged instances cannot truly be labeled "prosecutorial misconduct." Rather, they were the typical sort of questions asked or comments made during the normal course of a trial .[37] These instances fall within the broad parameters of effective advocacy and do not constitute error. Moreover, the trial court sustained defense counsel's objections in each instance, thereby

---

**37.** Specific examples include: the prosecutor's question to David Castillo regarding whether Appellant's attorneys misrepresented their identities before questioning him; (Tr. 1501.) the prosecutor's comment to Jack Stringer that "[y]ou don't want to answer the question;" (Tr. 1509.) the prosecutor's question to Ms. Zuniga regarding her lack of memory; (Tr. 1289.) the prosecutor's questions to Ms. Zuniga regarding prior fire inci-

dents; (Tr. 1292, 1294.) the prosecutor's comment that he was "having a little trouble" during cross-examination of Benny Zuniga; (Tr. 1385.) the prosecutor's question regarding when Appellant "pulled a knife;" (Tr. 1398.) the prosecutor's statement that "[h]e told me just last night that, that's what he told you;" (Tr. 1409.) and the prosecutor's statement that "we have heard different." (Tr. 1415.)

curing any possible error. *Pickens v. State,* 1993 OK CR 15, 850 P.2d 328, 341.

¶ 45 Other alleged aspersions were not objected to and are thereby waived absent plain error. Most of these occurred during closing arguments. However, one instance involved a statement by the prosecutor, following David Castillo's testimony. The prosecutor stated, "Sorry David. After all this, what does it matter." This statement followed an instance where defense counsel called David Castillo "a liar." The prosecutor objected to this comment, and his objection was sustained. Considering the context and the lack of defense objection, we find no plain error with respect to this passing comment.

¶ 46 With respect to the alleged aspersions cast during closing arguments, Appellant cites thirteen examples. Of these thirteen instances, the trial court sustained defense counsel's objections on six occasions, and ordered the jury to disregard the comment or commanded the comment or question to be stricken from the record. On six other occasions, no objections were voiced by the defense, thus waiving all but plain error. On the remaining occasion, the trial court ruled against defense counsel's objection.

¶ 47 We find several comments by the prosecutor during closing argument were clearly improper. The prosecutor was wrong to argue: "Bring this guy in here from Ohio, pay him to come in here to testify. He's an expert. Here's what we need to testify. Here's your ten grand. Thank you.";[38] "If he's telling the truth for the first time in his life, nine good law-abiding citizens are not."[39]; "Well, that's the biggest bunch of crap I've ever heard."[40]; and "he drummed up a dope dealer rat to lie for him ten years later."[41] These comments went

beyond the bounds of what can be considered fair argument. Nevertheless, the trial court did an admirable job, sustaining defense objections on each occasion. The trial court ordered the comments stricken from the record and on two occasions admonished the jury to disregard them. Again, we find these errors were cured. *Pickens,* 850 P.2d at 341.

¶ 48 With respect to those instances where the defense failed to object, we cannot find plain error resulted. Prosecutorial misconduct will not cause a reversal of judgment or modification of sentence unless its cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding. *Douglas v. State,* 1997 OK CR 79, 951 P.2d 651, 674. While several instances were objectionable, unnecessarily risky, and even offensive,[42] we must review them in light of the entire record. In so doing, we are unable to conclude that the remarks were so prejudicial as to adversely affect the fundamental fairness and impartiality of the first stage proceedings.

¶ 49 Appellant also claims the prosecutors improperly commented on the fact that Appellant did not testify and elicited improper sympathy for the victims. However, before a purported comment at trial on a defendant's failure to testify will constitute reversible error, the comment must directly and unequivocally call attention to that fact. *Hansford v. State,* 1988 OK CR 264, 764 P.2d 910, 912. Reading the prosecutor's comment in context, we cannot say he unequivocally called attention to Appellant's decision to not testify. Moreover, we find the prosecutor did not elicit improper sympathy for the victims in the opening statement or closing argument. Proposition three is therefore denied.

**38.** Tr.1967.

**39.** Tr.1974.

**40.** Tr.1976.

**41.** Tr.2061.

**42.** One Prosecutor ridiculed defense witnesses: "Mr. Taylor fell flat on his face;" (Tr.2032.) "the guy that's making so much money off this deal, it's sinful and the guy that solved every major disaster in the history of the United States since the Lincoln era;" (Tr.2034.) "He must not be much of an investigator if he's really telling you the truth;" (Tr.2035.) and "He drummed up a dope dealer to lie for him and his mother to lie for him and a paid advocate to come all the way from Ohio to make a fast buck." (Tr.2061.)

### F.

¶ 50 In his seventh proposition of error, Appellant claims his trial counsel rendered ineffective assistance. He cites four instances, only one of which is worthy of discussion.[43]

¶ 51 ·Appellant claims his trial counsel was ineffective for failing to object to the prayer of the trial judge. Appellant argues the prayer indicated a source higher than the judge or jury was responsible for justice, diminished the jury's sense of responsibility, and violated the long-standing concept of separation of church and state. Based upon these assertions, unsupported by authority, citations to the record, or any form of legal analysis, Appellant claims he is entitled to a new trial.

¶ 52 Before the parties appeared before the jury panel, the trial judge informed counsel of his "practice of opening the Court session with a prayer" (Tr. 4). The trial judge then stated, "it is not an official prayer, but merely the exercise of my freedom to exercise my religion as afforded to me as a citizen. If you're uncomfortable with being here during my prayer, you may excuse yourself. You are welcome to remain." [44] The trial judge then read the prayer to counsel.[45]

¶ 53 Thereafter, the trial judge asked the parties to indicate on the record whether or not they objected to the prayer. Appellant's counsel stated, "I have no objections. In fact, I would hate for everyone to think my

client didn't · have a prayer." [46] Appellant's counsel then stated he had talked with Appellant regarding this issue, and Appellant indicated, "I'm a believer. The prayer is fine with me." Appellant's counsel announced, "I can state in the record that my client concurs that the prayer is appropriate." The prayer was later recited to the jury.[47]

¶ 54 The record does not support Appellant's ineffective assistance of counsel claim. Appellant was advised by his counsel regarding the trial judge's proffered prayer and his right to object to its use. Appellant made an informed decision not to object. He has shown neither deficient performance by his counsel nor prejudice he has suffered as a result of his counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's decision with respect to this issue cannot be considered so deficient as to render the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

¶ 55 Nevertheless, we must warn trial judges against the practice of offering prayer before criminal trials due to the strong potential for error in the trial proceedings. The issue of prayer in a public forum has been a hotly debated topic in the United States Supreme Court for many years. While Supreme Court Justices come and go, this issue does not. Thus, in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330,

---

43. Appellant's claim that trial counsel was ineffective for failing to properly object to any issue this Court finds not properly preserved is waived for lack of specificity. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1999). The same is true for Appellant's claim that trial counsel was ineffective for failing to ascertain Appellant's arson expert had a misdemeanor conviction regarding his status as an arson investigator. Nevertheless, the record indicated counsel did know of the conviction and moved forward, as a matter of trial strategy. (Tr. 1710.) Appellant's claim that trial counsel was ineffective for failing to present expert testimony on juvenile fire setters is without merit because Appellant's counsel affirmatively pursued admission of such evidence, albeit unsuccessfully.

44. These same words were recited when the trial began and were apparently directed to everyone in the courtroom, including the jury panel.

45. "Dear Heavenly Father, you are due glory, honor, and power. I pray for strength to give You glory, honor, and power. You have created all things for Your pleasure. May we be pleasing to You. I acknowledge You made this day. May we rejoice and be glad in it. Help me and all here to be still and know that You are God. I ask that You grant me and all here wisdom to discern justice and to do justly. I pray Your peace will inhabit this place. Thank you for Your boundless love. In the name of Jesus, my Lord and Savior, I pray. Amen."

46. Tr. 5.

47. Tr. 16.

77 L.Ed.2d 1019 (1983), the Supreme Court, by a six to three vote, upheld the Nebraska legislature's practice of opening the state's legislative session with a prayer offered by a chaplain paid with public funds. In so doing, the Supreme Court reasoned that the "opening of sessions of legislative and other deliberative bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786, 103 S.Ct. at 3333. Moreover, the opinion pointed out that "[i]n the very courtrooms in which the United States District Judge and later three Circuit Judges heard and decided this case, the proceedings opened with an announcement that concluded, 'God save the United States and this Honorable Court.' The same invocation occurs at all sessions of this Court." *Id.* The Court thus held "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment." *Id.* at 792, 103 S.Ct. at 3336.

¶ 56 More recently, in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a deeply divided Court, by a five to four vote, found that a public school principal's decision to invite members of the clergy to give "nonsectarian" invocations and benedictions at graduation ceremonies violated the central principles of the Establishment Clause of the Constitution. The Court found the "First Amendment's Religion Clauses means that religious beliefs and religious expressions are too precious to be either proscribed or prescribed by the State." *Id.,* 505 U.S. at 589, 112 S.Ct. at 2656. The Court distinguished its holding from that in *Marsh*

*v. Chambers,* finding there were "[i]nherent differences between the public school system and a session of a state legislature." *Id.* at 596, 112 S.Ct. at 2660.[48]

¶ 57 Likewise, there are differences [49] between the instant case and Supreme Court cases referenced above. Here, we are dealing with a criminal proceeding, not a civil one. A criminal proceeding presents unique concerns, such as the choosing of a fair and impartial jury, the presumption of innocence, the trial court's role in sentencing, and a defendant's overall right to a fair trial.[50]

¶ 58 Very few published cases have dealt with this issue in the context of a criminal trial. Those that have addressed the issue have required an affirmative showing of prejudice. Thus, in *United States v. Walker,* 696 F.2d 277 (4th Cir.1982), the Fourth Circuit Court of Appeals found nothing prejudicial in a prayer offered by a minister who had been selected by the trial court. Nevertheless, the court deemed the practice "needlessly risky" and discouraged its further use. Id. at 282. A similar result was reached by the Court of Criminal Appeals of Alabama in *Huff v. State,* 596 So.2d 16, 21 (Ala.Crim. App.1991).

¶ 59 Appellant has cited no cases which have held a trial court's prayer constitutes plain error requiring a new trial, nor have we located any.[51] Under the record before us, a new trial is not required. However, while the trial judge's desire to seek "wisdom to discern justice and to do justly" is certainly commendable, we strongly discourage this

---

48. Those differences were essentially the age of attendees. Thus, the Court found the "influence and force of a formal exercise in a school graduation are far greater than the prayer exercise we condoned in *Marsh." Lee v. Weisman,* 505 U.S. at 597, 112 S.Ct. at 2660.

49. Of course we also recognize some similarities between this case and the Supreme Court cases. The public prayer offered by the trial judge (before the public trial began) is somewhat similar to the legislative prayer offered in *Marsh.* Additionally, a trial judge's authority and control over trial proceedings are somewhat similar to those addressed in *Lee* with respect to public school officials.

50. While the trial judge provided listeners the opportunity to excuse themselves from the courtroom and indicated he was simply exercising the freedom of religion afforded to him as a citizen of this country, we find these formalities did not remove his actions from the realm of official conduct. Moreover, see Canon 3 of the Code of Judicial Conduct, 5 O.S.1991, ch. 1, app. 4.

51. We do note, however, that the Fourth Circuit Court of Appeals issued a permanent injunction against a criminal trial judge engaging in similar conduct in *North Carolina Civil Liberties Union Legal Foundation v. Constangy,* 947 F.2d 1145 (4th Cir.1991). Of course this was a civil trial with different concerns at stake.

practice which has great potential of inviting error in the trial proceedings.

## SENTENCING STAGE ISSUES

### A.

¶ 60 In his eighth proposition of error, Appellant claims he was denied a fair sentencing proceeding because the State was allowed to impeach Appellant's psychologist by reference to a conclusion made during a competency proceeding in Appellant's first trial. Appellant claims this was improper because he had not been *Mirandized* or provided counsel prior to the evaluation, citing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) in support.

¶ 61 This proposition is without merit. During the second stage proceedings, Appellant called Dr. Ray Hand, a licensed psychologist as a witness. Dr. Hand testified regarding psychological testing and evaluations he had conducted with respect to Appellant. He discussed psychological problems and stresses related to refugees, Appellant's intellectual functioning, Appellant's behavioral history in the Department of Corrections, and his opinion regarding "whether of not Mr. Martinez would be a danger to anyone in the future" (Tr. 2209–25). Dr. Hand opined Appellant did "not particularly fit with that history of a lot of aggression or anti-social behavior."

¶ 62 In *Estelle* the United States Supreme Court held that a "criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Estelle*, 451 U.S. at 468, 101 S.Ct. at 1876. Here, that rule obviously does not apply, as Appellant was the one who introduced the psychological evidence, not the State. The State was entitled to cross-examine Dr. Hand regarding his opinions, because Appellant opened the door. The introduction of this evidence for such limited rebuttal purposes does not constitute a Fifth or Sixth Amendment violation. *Buchanan v. Kentucky*, 483 U.S. 402, 423–25, 107 S.Ct. 2906, 2918–19, 97 L.Ed.2d 336 (1987); *Traywicks v. State*, 1996 OK CR 54, 927 P.2d 1062, 1064.

### B.

¶ 63 In his ninth proposition of error, Appellant claims he was denied a fair sentencing proceeding due to improper remarks by the prosecutor and through the introduction or reference to improper prejudicial evidence. He cites to six instances occurring before closing arguments and to several instances occurring during closing arguments.

¶ 64 With respect to the six instances occurring before closing arguments, we find they did not result in a denial of a fair sentencing proceeding. The first instance and second instance, relating to questions about Appellant's prior arrests, were cured when the trial court sustained defense objections or asked the prosecutor to state the questions another way.[52] The third, fourth, fifth, and sixth instances, all relating to the testimony of Dr. Hand, were also resolved fairly by the trial court or when the prosecutor withdrew the question.[53] We find no plain error with respect to any of these instances.

¶ 65 We find several comments made during the prosecutor's closing arguments to be objectionable, however. The prosecutor sought to invoke societal alarm by stating:

> If you assess any penalty other than death, you don't know what kind of threat he'll be allowed to present to other people. . . . You have one sentencing option available where you know that. You've got one, and one only, that guarantee he's not going to hurt anybody else, and he's not going to kill anybody else.[54]

Further, the prosecutor argued, "[y]ou have the final say, Ladies and Gentlemen, on whether Tillman County and the world is

---

**52.** Tr. 2143–44; 2155–56.

**53.** Tr. 2241–45; 2262–63; 2230–31.

**54.** Tr. 2302.

safe from Gilberto Martinez." [55] Later, the prosecutor stated, "I don't care what he's done in the last ten years, watched every second. Given the opportunity and appropriate circumstances, he's as cold blooded and dangerous today as he was the night this occurred." [56] Finally, the prosecutor reasoned, "He's getting no more or less than he deserves for what he did to these little girls."

¶ 66 These statements are troubling. Why a prosecutor would go to the trouble of seeking the death penalty against a defendant, spend months in preparation and several weeks trying the case, and then risk the entire proceeding in his closing words to the jury is simply beyond our comprehension. Nevertheless, we must ask whether these statements resulted in Appellant receiving an unfair trial.

¶ 67 Here, defense counsel objected to only one of these closing remarks, thus waiving all but plain error. When determining whether a prosecutor's closing remarks were outside the record and so prejudicial as to warrant a reversal, the error is to be considered in light of the evidence and whether the remarks can be said to have influenced the verdict against the appellant. *Pickens*, 850 P.2d at 343. Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such to deprive the defendant of a fair trial. *Duckett v. State*, 1995 OK CR 61, 919 P.2d 7, 19. While the prosecutor's closing arguments were clearly error and were at the very edge of what we consider to be constitutionally acceptable, we cannot say that they deprived Appellant of a fair sentencing proceeding.

### C.

¶ 68 In his tenth proposition of error, Appellant claims there was insufficient evidence to support the especially heinous, atrocious, or cruel aggravating circumstance. We disagree.

¶ 69 The standard for determining the existence of the "especially heinous, atrocious, or cruel" aggravator was restated in *Cheney v. State*, 1995 OK CR 72, 909 P.2d 74, 80:

> [T]his Court has limited this aggravating circumstance to cases in which the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." As to the extreme mental cruelty prong of this aggravating circumstance, "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created."

(Citations omitted). When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. In making this determination, this Court should view the evidence in the light most favorable to the State. *Woodruff v. State*, 1993 OK CR 7, 846 P.2d 1124, 1147.

¶ 70 Reynalda and Margaret Castillo died of smoke inhalation. Dr. Chai Choi, forensic pathologist and medical examiner, testified that the deaths were "not instantaneous" and that the girls were alive for "at least a few minutes." [57] Dr. Choi testified she felt the girls had become unconscious and then died shortly afterward. She found soot in the girls' airways and lungs, indicating they were alive at the time of the fire. [58]

¶ 71 David Castillo testified that, prior to the fire, he and the other Castillo children got tired and went to bed. It was approxi-

55. Tr. 2303.

56. Tr. 2304.

57. Tr. 1112.

58. Tr. 1115.

mately 9:30 p.m.[59] At some point in the night, Appellant arrived and was banging on Mary Castillo's window. David awoke, but the other children did not.[60] After the fire started, somewhere around 4:00 a.m., David went to the window of his sisters' room and attempted to rescue them. He was unsuccessful. The window to the girls' room was blocked, and the room was filled with smoke. David testified that he heard one of his sisters "asking for Mommy".[61]

¶ 72 Jose Castro arrived at the house while it was on fire. He attempted to locate the girls inside the house and heard them screaming during this time.[62] One of the girls screamed, "Mommy, Mommy." [63]

¶ 73 Wayne Anderson, the first Fireman to enter the burning house, testified that firemen are "trained when we're doing a rescue, a lot of times a body will pile up against doors, people trying to get out." [64] He further testified that persons caught in a fire "try to crawl away from the fire. They'll try to hide themselves from the fire. They go in closets. They'll get in under sinks, cabinets, dirty clothes hampers. They just— your survival instinct takes over, and you try to protect yourself, hide from the fire." [65] Anderson found the two girls in their bedroom, but not on their bed. One was found in the corner of the room, and the other was found by the doorway, in front of some chest of drawers.[66]

¶ 74 Fire Marshall Larry Odem testified regarding "pour patterns" of gasoline which went into the girls' bedroom, across the girls' mattress and up to the area of a trash can sitting in the middle of that room.[67] Carpet samples under that trash can also revealed the presence of gasoline.[68]

¶ 75 This evidence, when considered together, was sufficient for a juror to believe that the girls were alive during the fire and sought, unsuccessfully, to escape. In so doing, a juror could reasonably have believed the girls suffered extreme physical abuse and mental anguish as a result of being trapped in a smoke-filled room engulfed by fire. For young children, we can think of very few circumstances that would be more mentally traumatic.

### D.

¶ 76 In his eleventh and twelfth propositions of error, Appellant presents issues which this Court has previously entertained and rejected. We continue to find the instructions we have approved for use with the especially heinous, atrocious, or cruel aggravating circumstance are not unconstitutionally vague. *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 782; *Mayes v. State*, 1994 OK CR 44, 887 P.2d 1288, 1319. Additionally, we again find double jeopardy principles were not violated when the "great risk of death to more than one person" aggravating circumstance was imposed against Appellant with respect to each of the two murder counts. *See Slaughter v. State*, 1997 OK CR 78, 950 P.2d 839, 859 ("There was no duplication of circumstances, as in each murder Appellant evinced the same callous, reckless disregard for the sanctity of human life.")

### ISSUES AFFECTING BOTH STAGES OF TRIAL

### A.

¶ 77 In his fourteenth proposition of error, Appellant claims he was denied a

---

**59.** Tr. 842.

**60.** Tr. 843.

**61.** Tr. 846. In an affidavit David gave on the day of the fire, he claimed he saw his sisters sleeping on a cot together after the fire started. He claimed there was a big ring of fire circling their cot. This was while David was in the house. He then broke out a window in his room and escaped. When he attempted to rescue his sisters, there was too much smoke and heat. David claimed he heard his sisters yelling and screaming (State's Exhibit 1C–2).

**62.** Tr. 1263.

**63.** Tr. 1268.

**64.** Tr. 1004.

**65.** Tr. 1007.

**66.** Tr. 1008.

**67.** Tr. 1050.

**68.** Tr. 1061.

fair trial because the jury was not allowed to take notes during the trial. This proposition is clearly without merit. Appellant's lone citation on this point is an Oklahoma Supreme Court opinion which acknowledged note-taking by jurors was within the discretion of the trial judge. *See Sligar v. Bartlett,* 1996 OK 144, 916 P.2d 1383, 1387. Moreover, a majority of this Court has found note-taking by jurors to be discretionary with the trial court. *Cohee v. State,* 1997 OK CR 30, 942 P.2d 211, 214. Appellant has not shown any abuse of that discretion here.

### B.

¶ 78 Finally, in his fifteenth proposition of error, Appellant argues that the cumulative effect of the errors committed in his trial require his conviction and sentence to be reversed, remanded for a new trial, or modified. We do not agree.

¶ 79 We have found several arguments by the prosecutor in both stages of trial were improper. However, we have already considered their cumulative effect and determined Appellant received a fair trial. This proposition, therefore, is without merit.

### *MANDATORY SENTENCE REVIEW*

█ ¶ 80 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two aggravating circumstances: (1) Appellant knowingly created a great risk of death to more than one person; and (2) the murders were especially heinous, atrocious or cruel 21 O.S.1991, § 701.12(2), & (4). As discussed previously, we have found the especially heinous, atrocious or cruel aggravator to be supported by sufficient evidence. We also find the evidence was also sufficient to demonstrate Appellate knowingly created a great risk of death to more than one person.

█ ¶ 81 Mitigating evidence was presented by Appellant in the form of six witnesses who collectively testified to the following: Appellant has a history of being a responsible, dependable worker; Appellant experienced prejudice because of his Cuban heritage; Appellant missed work once to take care of his daughter; Appellant was good with children; Appellant was never hostile at work; Appellant was not known by one of his friends to be a heavy drinker or drug user; Appellant was not a management problem while in prison; Appellant was appointed to be one of only four "run men" in prison out of two hundred inmates; Appellant received only one write-up in prison during eight (8) years; Appellant had never been in a fight while in prison; Appellant has borderline to low intelligence; Appellant had little educational opportunities in Cuba; Cuban refugees often experience significant problems while attempting to adjust to American culture; and a psychologist testified Appellant's history did not particularly fit with having a lot of aggression or anti-social behavior.

¶ 82 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.

### DECISION

¶ 83 The judgment and sentence of death is hereby **AFFIRMED.**

STRUBHAR, P.J., concurs in results.

JOHNSON, J., and LILE, J., concur.

CHAPEL, J., dissents.