2006 OK CR 16

**Jess L. BREWER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2004–429.

Court of Criminal Appeals of Oklahoma.

April 18, 2006.

An Appeal from the District Court of Kingfisher County; the Honorable Susie Pritchett, Associate District Judge.

Daniel P. Stake, Stake and Henry, PLLC, Kingfisher, OK, David Autry, Oklahoma City, OK, counsels for appellant at trial and appeal.

E.A. Gates, 1st Assistant District Attorney, District Attorney's Office, Kingfisher, OK, counsel for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, OK, counsels for the State on appeal.

## SUMMARY OPINION

LUMPKIN, V.P.J.

¶ 1 Appellant, Jess L. Brewer, was tried by jury in the District Court of Kingfisher County, Case Number CF–2003–02, and convicted of eight separate counts of Cruelty to Animals, in violation of 21 O.S.2001, § 1685.[1] The jury set punishment at $500 for each count. Appellant now appeals his convictions and sentences.

¶ 2 Appellant raises the following propositions of error in this appeal:

I.  Prosecutorial misconduct denied Appellant a fair trial;

II. The State violated its pretrial discovery obligations with respect to witness Richard Herren; and

III. The introduction of inadmissible hearsay deprived Appellant of a fair trial and denied his Sixth and Fourteenth Amendment rights to confront witnesses.

After a thorough consideration of these propositions and the entire record before us, including the original record, transcripts, and briefs of the parties, we find Appellant's convictions should be modified, based upon issues raised in Proposition One, but the sentences should remain the same.

### Facts

¶ 3 The evidence in this case leaves little doubt that three individuals—Appellant Jess Brewer, Tom Sturgeon, and Jimmy Flaming—formed a partnership[2] for the purpose of buying a herd of skinny, malnourished horses from New Mexico Navajo reservations. The partnership agreement was oral. It was a handshake deal between three good old boys who had a lot of livestock experience. The exact terms of the partnership depends largely upon the word of those involved with the transaction.

¶ 4 Due to New Mexico drought conditions, the horses were in poor condition. Many were dying. The plan was to bring them to Oklahoma, so they could be grazed, fattened up, and sold for profit. The profits would be split three ways, after Appellant recouped his investment. Jimmy Flaming was to find the horses, negotiate their purchase, and make arrangements for shipping them.[3] Appellant was to purchase the horses. Tom Sturgeon had the sole responsibility for feeding and taking care of the horses and then selling them, as he owned a preconditioning business that did the same sort of work with cattle and horses, some his own.

¶ 5 Sturgeon's preconditioning business began experiencing financial dire straits. He eventually took another job and began liquidating his business. One of the primary questions in the case is what effect, if any, Sturgeon's financial situation had on the

---

1. Appellant was charged with seventeen counts of the crime, but the prosecution dismissed three at the conclusion of the State's case and the jury acquitted Appellant on six others.

2. One of the pervasive and challenging problems with this case was the State's theory, which took the position that Appellant was the sole owner of the horses and that two other individuals were something akin to independent contractors hired by Appellant. The problem, however, is that the testimony of the three individuals involved strongly suggests the business arrangement was a partnership. 54 O.S.2001, § 1–202 states "the association of two or more persons to carry on as co-owners a business for profit forms a partnership." Thus, the trial proceeded on one theory not fairly supported by the facts, while the witnesses all proceeded on another. This situation created legal havoc.

3. Tom Sturgeon knew Appellant had a finder for these horses when the deal was made in mid 2001. However, Sturgeon testified he didn't know Flaming was a part of the profit sharing arrangement until July of 2002, when Flaming moved to Oklahoma. His trial testimony on this point differed with his preliminary hearing testimony, when he claimed he knew about Flaming from close to the beginning of the arrangement.

partnership with Appellant. Sturgeon claimed he informed Appellant that he was out of the deal,[4] although his testimony on this point was vague. Appellant testified Sturgeon never informed him he was out of the partnership and at all times remained responsible for feeding the horses.

¶ 6 The evidence at trial concerning whether or not Sturgeon was "in" or "out" of the partnership was sharply conflicting. Some of Sturgeon's story was contradicted by the evidence at trial and by his own prior testimony and actions, while some of his story was, to a certain extent, corroborated.

¶ 7 From mid October until mid November of 2002, the pasture where the horses were grazing became too low, and horses began dying. The authorities discovered twenty-seven carcasses on November 19–20, 2002.[5] The carcasses were buried on November 20, 2002; only two were given necropsies, the animal equivalent of an autopsy. These two "probably" died from a combination of malnourishment, parasites, intestinal inflammation, degenerative heart, and possibly by being accidentally fed cattle feed containing lasolid, which is poisonous to horses.

¶ 8 Appellant was the only member of the partnership charged.[6]

### Legal Issues Raised

■ ¶ 9 In proposition one, Appellant claims prosecutorial misconduct denied him a fair trial. We agree the record is replete with instances of misconduct by the prosecutor, as well as improper argument and conduct by the defense. This was an ugly brawl

of a trial that went well beyond what could be considered professional.[7]

¶ 10 The State spent hours throwing mud at Appellant, rather than focusing on the evidence of who was responsible for the horses. For example, although Appellant gave several statements to police, the State kept highlighting the fact that he had declined to give a written statement. Of course, Appellant was not required to give a written statement and had the right to refuse. *See Connecticut v. Barrett,* 479 U.S. 523, 530, n. 4, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987) (finding *Miranda* gives defendants "a right to choose between speech and silence" and recognizing "there may be several strategic reasons why a defendant willing to speak to the police would still refuse to write out his answers to questions"). Appellant and Flaming had also "lawyered up" by speaking to Appellant's son, whom the prosecutor described as "a lawyer from Edmond, Oklahoma, who operates his legal shop out of the back of his house."

¶ 11 The State concentrated much of its case on issues that were irrelevant[8] to the charges brought and sometimes wholly unsupported by the evidence. Thus, the State spent a great deal of time with its conspiratorial "circling of the wagons" theory, at best a red herring, which simply showed Appellant and others acting within their constitutional rights and doing the typical sorts of things people do when they are under investigation for a crime, i.e., speaking to attorneys, seeking more information, and deciding when and if to talk to police. The State also presented weak theories that Appellant had tried to

---

4. Under 54 O.S.2001, § 1–601 a partner may disassociate from the partnership by giving his partners notice of an "express will to withdraw as a partner...." Even so, that disassociation is wrongful under 54 O.S.2001, § 1–602 if "in the case of a partnership for a definite term or particular undertaking" the partner dissociates "before the expiration of the term or the completion of the undertaking." What effect these provisions may have on one's criminal liability is uncertain and challenging to say the least.

5. It was difficult to ascertain when each died and whether or not they were part of the partnership herd.

6. The Cruelty to Animals statutes define a "person" liable under the statute to include "any individual, ... partnership, two or more persons having a common interest, or other legal entity." 21 O.S.2001, §§ 1680.1, 1685. Thus, the partnership itself *could* have been prosecuted.

7. Time after time, the trial judge instructed the parties to stop using "speaking objections." Her instructions were ignored.

8. To the extent it can be argued said issues and evidence had any relevance, their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. 12 O.S.Supp.2003, § 2403.

destroy the evidence and that his "lawyer" son had tried to intimidate a witness.

¶ 12 The incidents of misconduct mentioned above are merely representative samples of this trial. As stated in *Tobler v. State*, 1984 OK CR 90, ¶ 28, 688 P.2d 350, 356, "the record is replete with thinly veiled, or in some cases, unveiled, attempts to induce the jury to decide the case based on emotional reactions."

¶ 13 Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such as to deprive the defendant of a fair trial. *Powell v. State*, 2000 OK CR 5, ¶ 151, 995 P.2d 510, 539; *Martinez v. State*, 1999 OK CR 33, ¶ 48, 984 P.2d 813, 826. Reversal is not required unless in light of the entire record, a defendant has suffered prejudice. *Martinez*, 1999 OK CR 33, ¶ 48, 984 P.2d at 826.

¶ 14 Of course, no criminal trial is perfect. *Powell*, 2000 OK CR 5, ¶ 152, 995 P.2d at 539. "[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." *Id.* "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.* Plus, we have always held that prosecutors have a broad freedom of speech and range of discussion. *Tobler*, 1984 OK CR 90, ¶ 28, 688 P.2d at 356.

¶ 15 Viewing the statements and conduct in context, it is apparent that both sides went beyond the broad freedom of speech and range of discussion. Be that as it may, there are nagging issues of prejudice, issues that are complicated by the partnership arrangement. The case was largely a swearing match between Appellant and Sturgeon, and the evidence on that issue was extremely close, with Sturgeon's story at times being contracted, inconsistent, and impeached while at other times being somewhat corroborated.[9] But Appellant admitted "we let the horses get hungry" and that admission alone is significant.

¶ 16 Regardless of Sturgeon's status as "in" or "out," it would be difficult to conclude, from the relevant evidence admitted at trial, that Appellant bore absolutely no responsibility for the animals, given his standing as a partner in the business and his knowledge of Sturgeon's dual employment and financial difficulties. Thus, while the jurors declined to impose jail or prison time, they still found Appellant had some responsibility. We agree.

¶ 17 Because the prosecutorial misconduct and bickering between the attorneys may have played some role in the jury's decision, we find relief in the form of modification is warranted.[10]

## DECISION

¶ 18 The judgments and $500 sentences are hereby **AFFIRMED,** except that the convictions are hereby **MODIFIED** to the lesser-included misdemeanors of Abandonment of Animals, pursuant to 21 O.S.2001, § 1686(A) & (D).[11] Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2005), the

---

9. Sturgeon could have been indicted for this crime. As such, he was an accomplice as a matter of law, and the jury should have been so instructed. This matter has not been raised on appeal, but our review of the issue of prejudice necessarily includes a review of the strength of the evidence.

10. To the extent Propositions two and three are not rendered moot by our resolution of proposition one, we find they entitle Appellant to no further relief. Appellant's motion to file a Reply Brief out of time is denied.

11. Under the specific and highly unique facts of this case and the specific charge brought, we find abandoning animals under 21 O.S.2001, § 1686(A) to be a lesser-included crime to the charged felony, Cruelty to Animals. There are two ways to violate that section: (1) when one "abandons said animal" or (2) when one "allows said animal to lie in a public street, road, or public place one (1) hour after said person receives notice by a duly constituted authority that the animal is disabled or dead". Here, Appellant abandoned the horses, specifically, by "failing to feed the animal". *See* 21 O.S.2001, § 1686(D).

**MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J., C. JOHNSON, A. JOHNSON, and LEWIS, JJ.: concur.