2005 OK CR 26

**Robert Wayne LAMBERT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. PCD–2002–974.**

Court of Criminal Appeals of Oklahoma.

Dec. 7, 2005.

## OPINION GRANTING POST-CONVICTION RELIEF

CHAPEL, Presiding Judge.

¶1 Robert Wayne Lambert was tried by jury, convicted of two counts of first degree murder, and received two death sentences. This Court affirmed Lambert's convictions for murder, and the United States Supreme Court denied certiorari.[1] This Court affirmed the denial of Lambert's first Application for Post–Conviction Relief.[2] Lambert's application for federal habeas corpus relief is pending in the United States District Court for the Northern District of Oklahoma.[3] On October 31, 2002, Lambert filed a Successor Application for Post–Conviction Relief in a Death Penalty Case, and a Request for Evidentiary Hearing on the issues of mental retardation and second-stage jury instructions. This Court remanded Lambert's case for an evidentiary hearing on the issue of mental retardation on November 15, 2002.[4]

On December 13, 2002, we held the evidentiary hearing in abeyance and directed the State to respond to Lambert's Successor Application. The State's response was filed March 10, 2003. On May 29, 2003, this Court remanded the case to the District Court of Creek County for a jury determination of mental retardation.[5] That jury hearing was conducted in May 2004, before the Honorable Donald D. Thompson, and concluded with a finding that Lambert is not mentally retarded. The District Court filed its Findings of Fact and Conclusions of Law with this Court on June 23, 2004. Lambert filed a Supplemental Brief in response to those findings and conclusions, raising eighteen propositions of error.[6]

¶2 The Court remanded this case for a jury determination followed by findings of fact and conclusions of law from the trial court. While the trial court's findings and conclusions assist this Court in its decision, the jury is the finder of fact in this proceeding. Thus, we will review the alleged errors occurring during the proceeding on remand in the same manner as errors raised on direct appeal from a trial on the merits. This Court reviews the jury's factual determination in the light most favorable to the State, to determine whether any rational trier of fact could have found that the defendant failed to meet his burden of proving mental retardation by a preponderance of the evidence.[7] After a complete review of the record, transcripts, exhibits and pleadings filed in this case, we find that factual and legal errors, as well as the interests of justice in this case, require relief. Rather than remand this case for yet another court proceeding, we modify Lambert's two death sen-

---

1. *Lambert v.State,* 1999 OK CR 17, 984 P.2d 221, cert. denied, 528 U.S. 1087, 120 S.Ct. 816, 145 L.Ed.2d 687 (2000).

2. *Lambert v. State,* No. PCD–1998–739 (Okl.Cr. February 10, 2000) (not for publication).

3. *Lambert v. Mullin,* No. 00–CV–0313 K (N.Dist. Okl.).

4. *Lambert v. State,* No. PCD–2002–794 (Okl.Cr. November 15, 2002) (not for publication).

5. *Lambert v. State,* 2003 OK CR 11, 71 P.3d 30.

6. The State did not file a supplemental brief. While Lambert's supplemental brief technically meets the content and citation requirements set forth in Rule 3.5, this Court strongly discourages use of this "abbreviated format", particularly in capital cases. Rule 3.5, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005).

7. *Myers v. State,* 2005 OK CR 22, ¶ 6, 7, 2005 WL 3334712.

tences to two sentences of life imprisonment without the possibility of parole.

¶ 3 Lambert committed the crimes in this case in 1987, and the case has been in the criminal justice system since 1988. Lambert's first trial resulted in convictions for murder and capital sentences which were reversed due to a serious legal error at trial. During the pendency of that first direct appeal to this Court, Lambert claimed, in a competency hearing, that his low intelligence prevented him from giving a voluntary confession—he raised the issue of mental retardation. Lambert was retried, convicted, and again sentenced to death. During that retrial Lambert presented evidence of mental retardation in mitigation, in an effort to avoid the death penalty. The State did not contest Lambert's claim that he was mentally retarded; in fact, the State argued that his mental retardation supported a death sentence because Lambert was unable to learn from his crimes and would continue to pose a danger to society. On appeal, Lambert again raised the issue of mental retardation and asked this Court to find that the execution of mentally retarded persons violates the United States Constitution. Based on United States Supreme Court law at that time, we declined.[8] In 2002, the United States Supreme Court determined that execution of mentally retarded persons is unconstitutional.[9] Lambert subsequently filed this application for post-conviction relief on the issue of mental retardation. It is in this context that we review the jury's determination that Lambert is not mentally retarded, and Lambert's claims of error on appeal.

¶ 4 In Proposition XV, Lambert correctly claims that the jury's verdict, that he is not mentally retarded, is contrary to the clear weight of the evidence. In order to prove mental retardation, Lambert must first demonstrate to the court that he had an IQ test under 70. After meeting this threshold requirement, Lambert must show, by a pre-

ponderance of the evidence, that he meets the three prongs of the *Murphy* test: subaverage intellectual ability, manifestation before age 18, and significant limitations in adaptive functioning in at least two of nine skill areas.[10] The jury had to decide whether, more probably than not, Lambert met this test. The overwhelming weight of the evidence shows he did.

¶ 5 This Court has defined mental retardation for *Atkins* purposes as:

A person is "mentally retarded": (1) If he or she functions at a significantly subaverage intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; selfcare; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.... [N]o person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.[11]

¶ 6 We begin by addressing the burden of proof. The test above requires that a defendant (a) meet the threshold legal requirement of an IQ test under 70, and (b) prove the three prongs of the *Murphy* test by a preponderance of the evidence: subaverage intellectual ability, manifestation before age 18, and significant limitations in adaptive functioning in at least two of nine skill areas. Only when all of these require-

8. *Lambert v.State*, 1999 OK CR 17, 984 P.2d 221, 238, *cert. denied*, 528 U.S. 1087, 120 S.Ct. 816, 145 L.Ed.2d 687 (2000) (per curiam, Chapel, P.J., concurring in part and dissenting in part).

9. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

10. *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556, 567–68 (footnotes omitted).

11. *Id.*

ments are met will a defendant meet the definition of mental retardation for capital sentencing purposes.[12] The third prong, significant limitations in adaptive functioning, describes deficits common in mentally retarded people.[13] These limitations may also be caused by other mental or social conditions. A defendant must show he has significant limitations in adaptive functioning, but is not required to show that mental retardation is the cause of his limitations in these skill areas. In order to counter such a claim, the State must present evidence negating those particular skill limitations. Unless a defendant's evidence of particular limitations is specifically contradicted by evidence that he does not have those limitations, then the defendant's burden is met no matter what evidence the State might offer that he has no deficits in other skill areas. In fact, the State need not present any evidence that a capital defendant can function in areas other than those in which a deficit is claimed. In capital mental retardation proceedings, the State's first response must always be to counter the evidence presented by the defendant.

 ¶ 7 In addition to being a threshold requirement, evidence of IQ testing may be admitted to the jury to prove whether a defendant functions at a significantly subaverage intellectual level. Lambert presented evidence of several tests for this purpose. All six IQ tests over 21 years of Lambert's

life, beginning in childhood, placed him under 70, and thus within the mildly mentally retarded range. This includes the test administered by the State's own expert, Dr. Call, on which Lambert had an IQ of 66. Dr. Call did not testify that Lambert was not mentally retarded. In fact, he explicitly stated he could not say that Lambert was not mentally retarded. In order to counter the overwhelming evidence of "at least one" IQ test under 70, Dr. Call testified that Lambert was malingering, and had done so since childhood, in an effort to be thought mentally retarded. Dr. Call's diagnosis stands alone in Lambert's testing record: although some medical professionals believed Lambert might have faked particular illnesses or mental problems over the years, he was never described as malingering with regard to the consistent mental retardation diagnoses. Other expert witnesses noted that it is difficult to fake mental retardation over a period of years.[14] Although Dr. Call testified that some of Lambert's other IQ tests were not reliable because they did not include a test of adaptive functioning, he himself did not administer an adaptive functioning test. Dr. Call administered one IQ test and an achievement test. In order to reach his "malingering" diagnosis, he administered five malingering tests.[15] Dr. Call is a forensic psychologist. His practice has not primarily been in the field of mental retardation, and he has not had a mentally retarded patient in

---

**12.** For instance, a severely depressed person may well have limitations in adaptive functioning sufficient to satisfy the third prong of the *Murphy* test. However, unless that person can meet the entire test, he will not be mentally retarded for capital sentencing purposes.

**13.** *Atkins*, 536 U.S. at 318, 122 S.Ct. at 2250; Davis, *Intelligence Testing and Atkins: Considerations for Appellate Courts and Appellate Lawyers*, 5 Journal of Appellate Practice & Process 297, 303–304 (Fall 2003).

**14.** *See also* Davis, *supra* n. 14 at 307–308 (malingering in capital mental retardation assessments unlikely, as defendant would have to begin malingering in childhood, before capital incentive occurred); Mossman, *Atkins v. Virginia: A Psychiatric Can of Worms*, 33 N.M. L.Rev. 255, 276 (Spring 2003); Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Is-*

*sues*, 27 Mental and Physical Disability L. Rep. 11, 14 (January/February 2003).

**15.** The tests were in this order: malingering, IQ and malingering, malingering, achievement, malingering, and malingering. In other cases, Dr. Call has administered a non-normed, nonstandardized "forced choice symptom validity test", the Blackwell Memory Test, which he created himself to test for malingering. *See Salazar v. State*, PCD–2002–984; *Blonner v. State*, District Court of Oklahoma County Case No. CF–99–6416. The trial court's determination that Blonner was not mentally retarded was appealed to this Court in O–2004–1175 (pending before the Court). This Court may take judicial notice of material filed with the Court. Dr. Call did not use the Blackwell Memory Test in this case. He did, however, use the Oklahoma Spelling Test, a non-normed, nonstandardized malingering test which he created. Trial Tr. V 1270–71.

a clinical setting for fifteen years.[16] However, since 2002 he has made a specialty of examining capital defendants for mental retardation.[17] Taking into account Dr. Call's testimony, the record easily shows that Lambert had at least one IQ test under 70. This, along with the expert testimony describing Lambert's intellectual functioning at those IQ levels, showed that he functioned at a significant sub-average intellectual level.

¶ 8 For further proof of the first prong of the *Murphy* definition, Lambert offered evidence of significant limited intellectual ability in each area. Several witnesses testified that Lambert had difficulty in communication orally and through reading and writing, and could not understand relatively simple instructions or information. For example, former cellmates testified they often filled out prison requisition slips for Lambert, and that he checked out books for other inmates to read since he did not read books. Prosecutors offered evidence from prison employees who had frequent but brief contact with Lambert, had received his requisition slips, and did not believe he was retarded. However, those employees could not say that Lambert himself filled out all his requisitions, as they were not present when the slips were written. They could not say Lambert read the books he checked out. While they disagreed on many issues, these witnesses could not contradict Lambert's cellmates' testimony.

¶ 9 Former teachers, jailers and family members testified about their difficulty in communicating with Lambert, as well as Lambert's lack of impulse control and apparent inability to understand thought processes or feelings. They also indicated that Lambert failed to learn from experience or understand logical consequences. The State's same institutional witnesses testified that they had little or no trouble communicating with Lambert, that he was not a discipline problem in prison, and that he seemed to understand the routines and procedures expected of him. None of these witnesses testified to long or complex conversations which required an exchange of ideas or feelings. In addition, all the expert witnesses agreed that mentally retarded persons adapt very well to institutional settings such as prison, and are unlikely to exhibit problems with impulse control in those settings. A rational trier of fact could not have found by a preponderance of the evidence that Lambert did not meet his burden to prove sub-average intellectual functioning which affected his abilities in the enumerated areas.

¶ 10 The second prong of the *Murphy* definition is satisfied. Lambert proved, and the State did not contest, that his deficits in functioning and IQ tests below 70 manifested before he was eighteen years old.

¶ 11 Turning to the third prong, Lambert provided proof of significant limitations in adaptive functioning in four skill areas: health and safety, academics, communication, and social and interpersonal skills. Lambert received very little parental supervision as a child. He was often unclean, hungry and inappropriately dressed. He lay in the street in traffic, ran under a moving train, cut and burned himself, and swallowed wire. Lambert left school after the 7th grade, when he was fifteen. Until that point, he made poor grades or failed in each class since kindergarten. He repeated first grade. He was placed in educably mentally handicapped (EMH) classes in elementary school; testimony indicated those classes at Lambert's school housed mentally retarded students. The known examples of Lambert's writing in the record show poor printing, very poor spelling, and lack of organized thought. He had few friends, preferred the company of younger children, and was easily manipulated. Prosecutors agreed with Lam-

16. On cross-examination, Dr. Call admitted none of the classes, seminars, or publications in his extensive CV are related to the area of mental retardation.

17. In each case, Dr. Call has either administered or attempted to administer several malingering tests, as he did here, along with an IQ test. *Salazar v. State*, PCD-2002-984; *Blonner v. State*, O-2004-1175; *Pickens v. State*, PCD-2002-983. Dr. Call attempted to administer several malingering tests to Pickens but was unable to do so when Pickens refused to speak with him. Dr. Call also testified in *Myers v. State*, 2005 OK CR 22, 2005 WL 3334712. However, he did not suggest Myers was malingering since most of Myers's IQ tests were above 70.

bert's claim of limitations in academics, health and safety, and social and interpersonal skills, but offered alternative explanations for these limitations. An alternative explanation for an agreed condition is not a negation of that condition. By accepting Lambert's assertions that he had limitations in these skill areas, the State failed to contradict his claims. A rational trier of fact could not have found that Lambert did not prove, by a preponderance of the evidence, that he had significant limitations in adaptive functioning in three skill areas.

¶ 12 Lambert proved all the factors in the *Murphy* definition by a preponderance of the evidence. He had six IQ tests under 70. He had sub-average intellectual functioning and limitations in adaptive functioning in three uncontested skill areas. All these factors manifested before Lambert was 18. The jury determination that Lambert is not mentally retarded is not supported by the record; no rational trier of fact, presented with this evidence, could have found that Lambert failed to meet his burden by a preponderance of the evidence. Although we give great deference to jury findings of fact, we are compelled to conclude that, given the evidence presented, the determination that Lambert is not mentally retarded is not supported by the evidence.

■ ¶ 13 In Propositions I and II, Lambert correctly claims that the trial court erred in refusing his requests to sequester the jury after the case was submitted to them for decision. After the jury was instructed and heard closing argument, the trial court overruled Lambert's request to sequester the jury, told jurors they were free to leave, and directed them to return at 9:00 a.m. the following day.[18] After deliberations began the jury requested a smoking break. Both parties asked the trial court to arrange to keep the jurors confined together during this break. The trial court refused, telling jurors they could go separate and smoke outside but not to discuss the case in small groups or allow anyone to approach them.[19] In *Johnson v. State*,[20] a remarkably similar case, we recently found this practice is error, and prejudice is presumed unless the State proves otherwise. In fact, the first error in this case is more egregious—in *Johnson*, jurors were only separated for a long lunch period, where here they were sent home for the evening. The State has not offered any explanation which would overcome the presumption of prejudice to Lambert. The morning jurors returned to begin deliberations, a local newspaper had an article about the case.[21] In *Johnson*, this error warranted reversal and remand for a new trial. Given the significantly different history of this case, we find that the error contributes to our decision to resolve this case by vacating the death sentence and imposing a sentence of life imprisonment without the possibility of parole.

■ ¶ 14 In Propositions III and V, Lambert complains that the trial court erred in refusing his repeated requests to conduct individual voir dire and subsequently passing the jury for cause over objection. The decision to conduct individual voir dire is within the discretion of the trial court, and will not be disturbed absent an abuse of discretion.[22] Retrospective mental retardation proceedings in a capital case are unlike any other jury proceedings, and require great care in order to avoid overwhelming prejudice to the defendant. The only issue in these proceedings is whether a defendant is mentally retarded. In remanding this case, we explicitly directed, "The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retarda-

---

18. Trial Tr. VII 2015.

19. Trial Tr. VII 2018.

20. *Johnson v. State*, 2004 OK CR 23, 93 P.3d 41, 48 (finding 22 O.S.2001, § 857 requires sequestration after the jury has heard instruction and argument, not after bailiff is sworn).

21. Defense Exhibit M.

22. *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, 393, *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000); *Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120, 1127, *cert. denied*, 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999).

tion." [23]

¶ 15 Defense counsel requested individual voir dire to ensure that the jury panel was not tainted by any prospective juror's knowledge of the facts of the crime in this highly publicized case. We cannot say the trial court abused its discretion in initially rejecting this request, before any prospective jurors had indicated they had prior knowledge of the case. We also do not find that the venire was tainted by some prospective jurors' brief assents when asked generally whether they remembered anything about the case. However, shortly after voir dire began, prospective juror Fugate responded to a general question about knowledge of the case by stating, "They kidnapped a woman and a man and put them in the trunk of a car and set it on fire." [24] Thus, during the first day of voir dire, all prospective jurors heard exactly what this Court explicitly stated they should not hear. Despite this clear violation of this Court's directions, the trial court continued to overrule Lambert's repeated requests to quash the panel. During the trial the trial court prohibited witnesses from using the words "kidnapping" or "arson" when referring to the crimes for which Lambert received the death penalty. However, jurors were already aware of these facts. They had heard them in voir dire.

¶ 16 The trial court's decision to deny individual voir dire led directly to a tainted jury panel.[25] This abuse of discretion was subsequently exacerbated by passing a tainted panel for cause, over Lambert's objections. Over almost a century this Court has consistently held that all doubts about juror impartiality should be resolved in the defendant's favor.[26] Lambert's subsequent trial before a tainted panel deprived him of an impartial jury, thus violating his right to due process.[27] In combination with other errors, these errors in voir dire compel us to grant relief.

¶ 17 In three propositions, Lambert complains that irrelevant, inadmissible and prejudicial evidence was improperly admitted, and affected the jury's determination of mental retardation. All these propositions have merit. We will discuss each separately. However, they all rely on the same general legal principle—the application of the rules of evidence. The rules of evidence do not cease to apply merely because a jury is considering mental retardation rather than guilt or innocence. "Relevant evidence is that which has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." [28] Otherwise relevant evidence may be prohibited by the Oklahoma or United States Constitutions, Oklahoma statutes, or

23. *Lambert*, 71 P.3d at 31.

24. Trial Tr. I 115–116. Several jurors subsequently mentioned Fugate's comments in stating they now either knew or remembered something about the facts of the case. As Lambert argues in Proposition IV, this was merely one of several dubious voir dire rulings. For example, one prospective juror had been called to Lambert's co-defendant's jury venire, knew the victim's parents, and listened to that entire trial. The trial court refused to excuse him for cause. The trial court denied Lambert's motion for additional peremptory challenges to replace jurors with knowledge of the case, who should have been removed.

25. Prosecutors and the trial court appeared to believe that this error was cured when prospective jurors said they could set aside knowledge of the facts of the case when determining the issue of mental retardation. This reflects a fundamental misunderstanding about this Court's directions on remand. We recognize that a defendant is entitled to a fair jury, not a perfect one,

and some individuals may have had some knowledge of the case. However, our ruling was designed to protect the integrity of the mental retardation proceedings by ensuring that the jury panel as a whole did not hear the specific facts of crimes Lambert committed.

26. *See, e.g., Matthews v. State*, 2002 OK CR 16, 45 P.3d 907, 915, *cert. denied*, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570; *Spears v. State*, 1995 OK CR 36, 900 P.2d 431, 437, *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527; *Simpson v. State*, 1992 OK CR 13, 827 P.2d 171, 175; *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158; *Tibbetts v. State*, 1985 OK CR 43, 698 P.2d 942, 945; *Tegeler v. State*, 9 Okla.Crim. 138, 130 P. 1164, 1168 (1913), quoting *Johnson v. State*, 1 Okla.Crim. 302, 97 P. 1059, 1068 (1908).

27. *Harris v. State*, 2004 OK CR 1, 84 P.3d 731, 741; *Morgan v. Illinois*, 504 U.S. 719, 726, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992).

28. 12 O.S.2001, § 2401.

the evidence code.[29] When balancing a claim that particular facts of a crime are relevant to the issue of mental retardation, a trial court must still consider whether its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." [30]

¶ 18 The State proffered a great deal of evidence surrounding the facts of the capital crimes, as well as other crimes Lambert was alleged to have committed. Several witnesses were allowed to testify regarding Lambert's criminal activity in great detail, over objection. The State argued that evidence of any criminal activity shows an ability to think abstractly rather than concretely, and to plan and execute schemes beyond the capacity of mentally retarded persons. Assuming that, in particular instances, this is true—that a particular crime requires a level of abstract thinking showing intelligence and thus is relevant to mental retardation proceedings—that evidence must still be weighed under the test above before it is admissible. Nothing in the record before this Court suggests that the trial court weighed the bulk of this evidence for the danger of unfair prejudice, confusion of the issues, or the possibility that it might have misled the jury. Indeed, the record suggests that this fundamental rule of evidence was disregarded.

■ ¶ 19 In Propositions VIII and X Lambert complains that his constitutional rights were violated by the introduction of irrelevant, inadmissible and prejudicial evidence relating to his capital crimes as well as other adjudicated and unadjudicated crimes. We agree. When remanding this case we explicitly stated,

Lambert's criminal conviction and death sentence are not relevant to this issue. The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation. *Any such evidence should be narrowly confined to that issue.* The jury should not hear evidence in aggravation or mitigation of the murders for which Lambert was convicted, or any victim impact evidence.[31]

■ ¶ 20 We first note that this mandate was not confined solely to evidence of the capital crimes, but to any crime for which Lambert *was convicted.* It did not contemplate evidence of unadjudicated crimes at all, beyond noting that there should be no evidence in aggravation of the capital crimes. Over objection, the State presented several witnesses who testified in detail regarding two unadjudicated crimes Lambert was alleged to have committed in Kansas.[32] These crimes had been used in aggravation against Lambert during his death penalty case. As Lambert had not been convicted of these crimes, this evidence was not within the restrictions on admissible evidence set forth in *Lambert,* was highly prejudicial without being probative on the issue of mental retardation, and should not have been admitted. The State also presented evidence that Lambert had abused drugs. Lambert had no drug convictions. Mental retardation is a condition present at birth,[33] and subsequent drug abuse makes it no more nor less likely. This evidence was irrelevant and was improperly admitted.

¶ 21 The prosecution consistently argued that evidence of the facts of crimes was necessary to show that Lambert could function—drive, give and understand directions, use a weapon, etc. This reveals a fundamental misunderstanding regarding the burden of proof in these proceedings. As we note

29. 12 O.S.2001, § 2402.

30. 12 O.S.Supp.2003, § 2403.

31. *Lambert,* 71 P.3d at 31 (omitted, emphasis added).

32. The witnesses included the two victims, who were allowed to testify at length to specific details of the crimes, including holding them

against their will, physical violence, and crimes committed upon their bodies. Other witnesses also mentioned knowledge of the details of these crimes.

33. *Murphy,* 66 P.3d at 460 ("Mental retardation is not an after-acquired disability that arises from a person's lifestyle choices, but one that originates from birth.").

above, Lambert was required to show, by a preponderance of the evidence, that he had limitations in adaptive functioning in two of nine areas: communication, self-care, social and interpersonal skills, home living, self-direction, academics, health and safety, use of community resources, and work.[34] Unless Lambert's evidence of particular limitations was negated by evidence presented by the State *on those issues,* then Lambert's burden was met. None of the evidence of criminal activity went to any of Lambert's claims of adaptive function limitations. Thus, strictly speaking, none of it was relevant to disprove those claims. Its relevance regarding the prosecution's claims that Lambert could function in other areas was thus necessarily limited by the prosecution's failure to disprove Lambert's claims. The limited relevance of this evidence of criminal activity was substantially outweighed by the danger of unfair prejudice.

¶ 22 In addition, Lambert had to show that his subaverage intellectual level substantially limited his "ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others."[35] Again, the State should first focus on refuting any evidence presented by a capital defendant, before introducing additional evidence of intellectual ability. We discussed the State's efforts to do so above. This prong of the definition may have been the focus of the prosecution's arguments that evidence of criminal activity was relevant to show Lambert could give and follow directions, commit crimes based on his observation of potential victims, and order his victims and co-defendants to engage in specific actions. However, any potential relevance should still have been balanced against the danger that it would be substantially outweighed by unfair prejudice; the record shows this evidence, as detailed below, was more prejudicial than probative.

¶ 23 The prosecution also claimed that evidence of crimes was relevant because Lambert had chosen a life of crime. This argument suggests that the prosecution itself was confused regarding the purpose of this proceeding. Lambert's chosen profession would only be relevant to the issue of mental retardation if it were something a mentally retarded person could not do. For instance, if Lambert were a banker or teacher, this would cast doubt on his claim of retardation. However, all the experts testified that mentally retarded people can and do commit crimes. Lambert's alleged choice of a life of crime shows that he is a bad person, without resolving the issue of mental retardation. This argument could only confuse the issues in the case and mislead the jury.

¶ 24 In closing argument, prosecutors stressed that the evidence of crimes showed Lambert was "street smart" and therefore could not be mentally retarded. No evidence in the record supports the assertion that mildly mentally retarded persons cannot be "street smart" and survive outside an institution. In fact, Lambert's expert testified otherwise. All the evidence of "street smarts" was connected to Lambert's criminal activity. Again, this line of reasoning confused the issues and misled the jury.

¶ 25 The record does not show any serious attempt to comply with our instruction in *Lambert* that any evidence of crimes be narrowly confined to the issue of mental retardation. For example, over Lambert's objections the State presented evidence that Lambert had pled guilty to charges resulting from a "home invasion" crime.[36] One witness's testimony on this issue was presented to show that, during those proceedings, Lambert did not raise the issue of mental retardation. Whether previous counsel entering a guilty plea in a noncapital case chose to bring up mental retardation is not relevant to any issue in these proceedings. Another witness

34. *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, 568.

35. *Murphy,* 54 P.3d at 567.

36. The home invasion occurred in September, 1987, and Lambert entered a plea in March, 1988, after his arrest in the capital case occurred and capital proceedings had commenced. Prosecutors also used details of a crime Lambert committed as a juvenile, including a plan to break in to an old man's house, tie him up and rob him.

testified to specific details of the crimes involved, including kidnapping of the female victim and her hysterical state when found by police. These details were irrelevant to the issue of mental retardation and could only have served to confuse the issue and mislead the jury. Prosecutors argued the testimony was relevant to show that Lambert could understand and give directions and knew how to find places near where he had previously lived. No attempt was made to narrowly confine this evidence to that issue. If prosecutors wanted to show Lambert knew where he had lived before, could find it again, and could direct others to it, they should have put on that information without using the context of a criminal case by injecting facts of specific crimes. A third source of evidence regarding this home invasion was an audiotape of Lambert's confession to the crime, including his statement that they planned to rob that house because they thought it was a dope house. All the evidence recounting the facts of this crime was highly prejudicial.

¶ 26 The State presented a great deal of evidence regarding the facts of the capital crimes for which Lambert was convicted. This evidence included the victims' names; watching (or "stalking", as the prosecutor argued) the victims before the crime; the taking of the victims against their will at knifepoint; the use of BB guns resembling real guns; the victims' transportation to the location at which their bodies were found; Lambert's ability to cut a gas line; his subsequent drive, with his co-defendant [Hain], to a location in Kansas where his sister lived; Lambert's arrest; and his videotaped confession. While words referring to kidnap and arson were consistently barred or redacted from the testimony, facts describing or leading to those crimes were not. No attempt was made to narrowly confine any evidence which could have been relevant to mental retardation. Instead, the jury was permitted to hear almost every detail of the crimes, Lambert's subsequent flight, and his arrest.

¶ 27 The State argued Lambert's confession was necessary to show that he could talk with police, relate events, answer questions, and did not appear mentally retarded. It is unclear how any of this reasoning applies to the definition of mental retardation in capital cases.[37] Every expert who testified agreed that a mildly mentally retarded person can remember events and is capable of carrying on conversations on specific topics. Experts also agreed that mentally retarded persons can often drive, remember how to get places they have been before, and commit crimes which do not require abstract thinking. Experts and laypeople testified that one can look at and converse with a person and not tell whether they are mildly mentally retarded.

¶ 28 Even though it was of dubious relevance, a redacted videotape of his confession in the capital case was admitted over Lambert's objection and shown to the jury.[38]

---

37. *See Atkins*, 536 U.S. at 318, 122 S.Ct. at 2250: "Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." [s omitted.]

38. Throughout the tape Lambert volunteers very little but responds to specific questions. Lambert's confession begins with his statement that they were fixing to break into a house to rob it. The tape then skips. Lambert and his co-defendant [Hain] notice two people in a car, open its doors and tell the man and girl in it not to scream, get in, and tell the girl to drive. Lambert then says he had her stop and told her to get in the back seat with him, while Hain held a knife to the man's throat. They tied both victims up and put them in the trunk, after which Lambert drove the girl's car and Hain followed him in the man's truck to Sapulpa. They stopped and Lambert cut the car's gas line. The redacted tape picks up where officers ask Lambert where he originally saw the victims' car. While he knows the street, he does not know the area of the city until police officers give him the name. Lambert describes the girl's appearance and the victims' location in the car, then repeats the initial facts of the crime. Lambert said again that he and Hain got in the car and Hain put a

This confession begins with a plan to rob a different house. Lambert describes finding and taking the victims, Hain holding a knife to the male victim's throat, and driving to a separate location. Lambert gives a detailed description of how he cut the car's gas line, and how he heard the man making noise and trying to kick his way out of the trunk as Lambert walked away. He says they took $500 in cash from the victims. Any reference to arson or the car fire was redacted. However, jurors had heard in voir dire that Lambert had put the victims in the car's trunk and set it on fire, and could have made that inference from the redacted tape itself. Even assuming that some of the information in Lambert's confession, or his demeanor on the tape itself, was relevant to the issue of mental retardation, the tape as a whole was overwhelmingly prejudicial. The details above, for instance, are exactly the type of evidence this Court intended to prohibit. Hain's use of a weapon, the amount of money taken, and the victims' attempt to escape add nothing to the question of Lambert's mental retardation.

¶ 29 Much of the evidence of criminal activity was irrelevant and simply inadmissible. For example, the prosecutor asked one police officer if he was aware that Lambert was accused of crimes in Kansas, spanning three months, involving five women. There is no conceivable circumstance under which this information could be relevant to the issue of mental retardation. It could only serve to prejudice the jury.

¶ 30 The bulk of the State's case consisted of evidence of Lambert's crimes, adjudicated and unadjudicated. Each crime, beginning with Lambert's juvenile criminal activity, was described in detail by several witnesses, including (through audio and videotape) Lambert himself. In *Lambert*, this Court set forth parameters for this proceeding. Our intention was to offer Lambert and the State a fair trial on the sole issue of mental retardation. Attempting to determine whether a capital defendant is mentally retarded, after his conviction and the imposition of a death sentence, is difficult and fraught with danger. This Court intended to severely restrict any evidence of criminal activity, in order to avoid prejudice and confusion of the issues. Lambert committed a horrible crime. That crime, and others he committed, should not have been the focus of the mental retardation proceedings. The prosecution's use of this evidence shifted the focus away from Lambert's mental capabilities and to his criminal actions. The record shows that this improper and inflammatory evidence influenced the jury's verdict, which cannot be otherwise explained. As we concluded above, a rational trier of fact—that is, one not improperly influenced by prejudicial and inflammatory evidence—could not have found that Lam-

knife to the man's throat, and that he made the girl sit in the back next to him and gagged her. He said they got the man's truck, then tied him up and put him in the trunk of the car. Lambert described in detail how the man was tied. He again says they drove to Sapulpa where they stopped, got out, and he cut the car's gas line. The redacted tape picks up with Lambert saying they drove to Kansas, stopping at a friend's house first. He estimates the time of the crime, noting that it was turning daylight as they stopped the cars. The redacted tape begins again with Lambert saying he and his co-defendant took money and a wallet from the man's pockets, and he got $60 that the girl said was on her back floorboard. Lambert says the total was close to $500; Hain took charge of the cash and split it with him. Lambert tells officers where he and Hain stayed when they reached Wichita. Lambert says he told one person about the crimes, but that person told a lot of other people so he and Hain had to leave. Lambert described Hain to police in detail, particularly his tattoos, and stated when they first met. Returning to the

crime, Lambert stated he was driving when they left the crime scene. The tape is redacted throughout this portion. Lambert says some men's clothing was in the truck, and he left a tie somewhere in Kansas. After a pause, the tape begins again, with a redacted question about Lambert or Hain tying up the man. Lambert said they had two BB guns. He said the victims never asked to be let go, but asked him not to hurt them. He described what Hain wore. An officer asked whether, when Lambert walked away from the car, he heard hollering. Lambert said no, he heard the man making a noise, trying to kick his way out of the car. Lambert imitated the noise. The tape shows officers asking questions and Lambert responding with words and gestures, as the sound is redacted. The sound resumes where Lambert describes in detail how he cut the gas line with a tool Hain carried. Lambert says he knew Tulsa and Sapulpa police were looking for him. He describes his conversations with his sister, says he intended to turn himself in but was arrested first, and described his arrest.

bert did not meet his burden to prove mental retardation by a preponderance of the evidence. The trial court's finding of fact that the jury was not improperly influenced by this evidence is not supported by the record, clearly erroneous, and an abuse of discretion.[39]

¶ 31 In Proposition XI Lambert complains of irrelevant, inadmissible and prejudicial evidence relating to psychiatric and medical issues other than mental retardation. Lambert attempted to introduce portions of institutional records or transcripts of prior testimony bearing on the question of mental retardation. Over objection, prosecutors were allowed to use those records and transcripts in their entirety, and introduce other witnesses, to testify about personality tests Lambert had taken and psychiatric diagnoses other than mental retardation. At one point Lambert was diagnosed with a "conduct disorder". A later record states he had "dysocial disorder", which the prosecutor described in argument as a precursor to "antisocial disorder" or "sociopath". There were suggestions that Lambert might have other psychological problems such as schizophrenia. Mental retardation and mental illness are separate issues. It is possible to be mentally retarded and mentally ill. Lambert has not claimed to be mentally ill, and evidence of mental problems did not make the issue of his mental retardation more or less likely. Prosecutors used this information to argue that Lambert's adaptive functioning limitations were caused by something other than mental retardation. However, in doing so, they accepted Lambert's claims of adaptive functioning limitations. As we discuss above, when the State failed to negate those claims Lambert's burden of proof was met. This evidence, offered as an alternative to explain Lambert's limitations, was irrelevant. Its only possible relevance could have been if prosecutors used evidence of mental problems to argue that Lambert had no limitations in adaptive functioning. The record suggests this was an argument prosecutors could not make. Evidence of mental prob-

lems and other psychological testing should not have been admitted.

¶ 32 In Proposition XVIII Lambert correctly argues that the accumulation of error throughout these proceedings requires relief. We have discussed serious errors raised in Propositions I, II, III, V, VIII, X, XI and XV. Lambert raises several other claims, but the cumulative effect of the eight we have discussed requires relief. We therefore do not address the merits of his remaining propositions of error.

¶ 33 This case is, fortunately, an anomaly in our system. Lambert has raised the issue of mental retardation since 1994. Since then, the State has had ample opportunity to contest Lambert's claim that he is mentally retarded. Before 2002, the State chose not to do so. Instead, the State accepted his claim and argued that Lambert's mental retardation was a factor in aggravation supporting a death sentence. Only after *Atkins*, when a mentally retarded defendant can no longer face execution, has the State chosen to contest this issue. In doing so, the State attempted to discredit 21 years of IQ testing, including the test given by its own expert, all of which found Lambert was mildly mentally retarded. The State largely failed to address Lambert's claims of deficits in adaptive functioning in specific areas over the years. Instead, the State relied almost exclusively on evidence of Lambert's past criminal activity, arguing that he was not mentally retarded but had chosen a life of crime. These choices do not suggest an attempt to comply with either the spirit or letter of the law prohibiting the execution of the mentally retarded. Given the totality of the circumstances of this case, we now enforce that law.

## DECISION

¶ 34 Lambert's two death sentences are hereby **MODIFIED** to two life without the possibility of parole sentences. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch18, App.2004, the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

**39.** *Murphy v. State*, 2003 OK CR 6, 66 P.3d 456, 458; *Young* 12 P.3d at 48.

C. JOHNSON and A. JOHNSON, JJ.: concur.

LEWIS, J.: concur in part/dissent in part.

LUMPKIN, V.P.J.: dissent.

LUMPKIN, Vice–Presiding Judge: Dissenting.

¶ 1 I strongly dissent to the Court's alarming decision to vacate Petitioner's death sentence and then modify his sentence to life imprisonment without parole. The Court has no business replacing a validly reached and legally supportable jury decision with its own personal point-of-view.

¶ 2 In *Myers v. State*, 2005 OK CR 22, ¶ 7, 130 P.3d 262, 2005 WL 3334712 this Court set forth the standard of review we will use on appeal when a defendant challenges the sufficiency of the evidence following a jury finding that he or she is not mentally retarded. But now, in one of the first post-*Myers* cases, the Court has already grossly misapplied that standard to the extent it can be argued *Myers* has been overruled by implication. To apply a certain standard of review means more than using the right terminology. Here the Court actually applies *de novo* review in a crusade to impose its will over that of the finder of fact.

¶ 3 By stating that no rational trier of fact could have found Petitioner failed to meet his burden by a preponderance of the evidence, the Court ignores one important fact. Twelve rational jurors reviewed the evidence in this case and did in fact reach that conclusion. Unless we can say no rational juror could have possibly reached that decision upon viewing the evidence in a light most favorable to the State, we have a legal duty to affirm.

¶ 4 The Court's opinion can be reached in only two ways, and neither is legitimate.

The first is if we substitute our view of the evidence for the jury's. But this course is against our well-established case law that the jury is the exclusive judge of the weight and credibility of the evidence. *See Smith v. State*, 1996 OK CR 50, ¶ 23, 932 P.2d 521, 530; *Robedeaux v. State*, 1993 OK CR 57, ¶ 43, 866 P.2d 417, 429. It is also contrary to the very purpose of this Court. As set out in Article 7, § 4, of the Oklahoma Constitution, "the Court of Criminal Appeals shall have exclusive appellate jurisdiction in criminal cases".[1]

¶ 5 The second manner in which the Court could reach its decision is if the trier of fact is found to be irrational. But the Court does not go there, for obvious reasons. Instead, the opinion *seems* to find the jury's verdict is not worthy of credence because (1) the jury panel was tainted therefore Petitioner was not tried by an impartial jury and (2) because inadmissible evidence was heard and used in arriving at the verdict.[2]

¶ 6 As for the first point, the opinion finds the jury panel was tainted on the first day of *voir dire* by a comment from a prospective juror concerning facts of the crime for which Petitioner now sits on death row. The United States Supreme Court and this Court have long held that an accused is not entitled to a juror who knows nothing about his case. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). *See also DeRosa v. State*, 2004 OK CR 19, ¶ 17, 89 P.3d 1124, 1134; *Braun v. State*, 1995 OK CR 42, 909 P.2d 783, 792; *McBrain v. State*, 1988 OK CR 261, ¶ 16, 764 P.2d 905, 909. Rather, when evaluating whether a juror is sufficiently impartial to be allowed to serve, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *DeRosa*, 2004 OK CR 19, ¶ 17, 89 P.3d at

---

1. Appellate jurisdiction is that power and jurisdiction to review and correct those proceedings of inferior courts brought for determination in the manner provided by law. *Carder v. Court of Criminal Appeals*, 1978 OK 130, ¶ 12, 595 P.2d 416, 419; *State v. Cole*, 4 Okl.Cr. 25, 109 P. 736 (1910). It is not a license to become super-jurors. Under our legal system, juries, not judges, decide the facts. A cold appellate record is a poor substitute for a live courtroom.

2. Of course, the proper remedy, assuming either of these points has merit, is to send the matter back for a new trial. And it is quite telling that the Court doesn't choose that option. It's as if the opinion is saying an Oklahoma jury simply cannot be trusted to make the "right decision."

1134, *quoting Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642.

¶ 7 In the present case, the jurors said they could set aside any knowledge of the facts of the case they may have had and would decide the issue of mental retardation based solely upon the evidence presented at trial. This is all courts can ask of a juror. A review of the record shows the jury panel was not tainted.

¶ 8 Secondly, the rules of evidence were properly applied in this case. The trial judge carefully considered the probative value of evidence offered for admission versus its prejudicial impact. Both the defense and the State made objections repeatedly, and the record reflects numerous discussions on why particular evidence was or was not admissible. The record reflects that only evidence relevant to the issue of mental retardation was admitted.

¶ 9 Looking to that evidence and applying the *Murphy* standards, Petitioner made the threshold showing of a full scale IQ test score under 70. Then, concerning the first *Murphy* prong, the evidence was sharply conflicting concerning his ability to understand and process information, communicate, learn from experiences, engage in logical reasoning, control impulses, and understand the reactions of others. Thus, when viewed in a light most favorable to the State, there was more than enough evidence for jurors to reach the conclusion they did.

¶ 10 Appellant had several IQ tests that placed him near the top of the mildly mental-

ly retarded range. However, the State's expert challenged the validity of some of the tests and there was evidence of malingering from several credible sources. Petitioner's former teachers testified he was held back in school and placed in educable mentally handicapped classes, but the State's evidence showed his poor school performance could be attributed to parental neglect. One teacher testified Petitioner was a behavior problem. She had wanted to put him in a special education class, but Petitioner tested two points above the cutoff for that class. He dropped out of school after the 7th grade, but this was because he was suspended for hitting a teacher.

¶ 11 Petitioner's former cellmates testified he had trouble reading, writing, and communicating orally. But the State presented examples of Petitioner's writing and testimony from three Department of Corrections employees (two of whom worked with mentally retarded inmates) who had significant contact with him.[3] The employees testified Petitioner was able to converse like any other inmate, recreate, make purchases, read, write, sign his name, and keep clean. They did not think of him as mentally retarded. Indeed, he scored high enough to be recommended for Vo Tech and completion of his GED. The State also presented significant evidence of Petitioner's communications with police, which showed he could communicate effectively and remember events and details of his crimes.

¶ 12 As for the 3rd *Murphy* prong,[4] adaptive functioning,[5] the State was hard-

---

**3.** The opinion criticizes several State's witnesses because they did not testify to long or complex conversations with Petitioner, but it is questionable whether any of Petitioner's former cellmates ever had such conversations with him either.

**4.** As for the second *Murphy* requirement, the parties agreed that whatever Petitioner's condition was it had manifested itself before he turned eighteen.

**5.** Neither this opinion nor our prior cases address whether the defense must give pre-trial notice regarding the adaptive skill limitations they seek to prove. While all parties are granted the right of discovery in these proceedings, if the Court is going to require the State to specifically rebut the defendant's evidence, then the State should have notice before trial of the defense

evidence they must be prepared to answer. Here, during opening statements, defense counsel identified one of the specifically listed skills, self-care, and made other comments suggesting the adaptive skills of work, home living, and social/interpersonal skills. Assuming the defense adequately identified the adaptive skills it would try to prove, this case highlights how the Court's requirement that the State present only evidence to rebut the defendant's claims of adaptive functioning limitations, and no other evidence, results in an uneven playing field. Restricting the State's presentation of evidence in this manner is an improper attempt by this Court to tell the attorneys how to try their case.

More importantly this Court can always take judicial notice of the fact a defendant is not going to put on evidence in an area where the State has

pressed to rebut Appellant's claims that he could not maintain a job and has never lived independently, for Appellant has been incarcerated for 21 of his 38 years of life (a fact defense counsel disclosed to jurors during opening statements). Thus, the State had to rely on Appellant's criminal history.[6]

¶ 13 Whether or not prior crimes required abstract thought or complex planning relevant to the issue of mental retardation depends on the facts of that particular crime, not the type of crime committed. In Appellant's case, evidence of his prior crimes showed he did not have significant limitations in social/interpersonal skills—he was a leader and not a follower, as the experts said most mentally retarded people are. He communicated well. That is, he made himself understood to his cohorts and victims and he understood what his victims and the authorities said to him. Plus, he did not have significant limitations in self-direction, as he was able to evade authorities for weeks.

¶ 14 The crucial point is this: the evidence was conflicting on the first and third *Murphy* prongs. As such, the jury's decision must stand. This Court has no business substituting what "we would do" for what twelve competent jurors did. As we said in *Martinez v. State*, 1999 OK CR 33, ¶ 36, 984 P.2d 813, 824:

> ... a fundamental premise of our criminal trial system is that "the jury is the lie detector." Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."

984 P.2d at 824 (internal citations omitted).

¶ 15 According to *Myers*, "We will not disturb the jury verdict where there is any competent evidence reasonably tending to

support it." 2005 OK CR 22, ¶ 7, 130 P.3d 262, 2005 WL 3334712. If only that were true. However, rather than following the now established law, the Court disregards that law and the analysis it requires to reach a desired result. In doing so it seeks to tie the hands of the State of Oklahoma as to how it is able to present relevant evidence in all future cases of this type. I regret the Court has elected to overstep its bounds on so many fronts in this particular case. I had always believed the law and relevant evidence would dictate a decision. That has not proven true in this matter and because of that fact, I must dissent.

LEWIS, Judge, Concurs in part/dissents in part:

¶ 1 I concur in reversing the verdict in this case. However, I dissent to modifying the sentence. I would reverse and remand for a new trial on the issue of mental retardation.

---

the strongest evidence to rebut. It is for this reason that the State should be allowed to present all relevant evidence regarding a defendant's adaptive skills and not allow a defendant to deny the trier of fact of relevant evidence by parsing the method of presentation. In addition, by predetermining what evidence the State can present, this Court is exhibiting a definite bias against the State and its case.

6. Evidence of a defendant's prior criminal history should be admissible when it is relevant to mental retardation. In this case, the court was careful to admit only testimony concerning Petitioner's actions in specific criminal contexts. The jury did not hear any reference to the type of crime committed or any reference to any punishment Petitioner may have received.